**Darren LEWIS, Plaintiff,**

v.

**NORTH GENERAL HOSPITAL and 1199SEIU United Health Care Workers East, Defendants.**

No. 06 Civ. 4909(DC).

United States District Court, S.D. New York.

Aug. 23, 2007.

Darren Lewis, Bronx, NY, pro se.

Rosenbluth & Rosenbluth by Thomas S. Rosenthal, Esq., New York, NY, for Defendant North General Hospital.

Levy Ratner, P.C. by Allyson L. Belovin, Esq., New York, NY, for Defendant

1199SEIU United Health Care Workers East.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Darren Lewis, proceeding *pro se,* sues his former employer, defendant North General Hospital (the "Hospital"), and his former union, defendant 1199SEIU United Health Care Workers East (the "Union"). Lewis contends that the Hospital discriminated and retaliated against him, breached contracts with him, and defamed him. He contends that the Union breached its duty of fair representation by failing to represent him in grievance proceedings and by declining to arbitrate his grievance.

Defendants move for summary judgment. For the reasons that follow, the motion is granted and the complaint is dismissed in all respects.

## STATEMENT OF THE CASE

### A. The Facts

For purposes of these motions, the facts are construed in the light most favorable to plaintiff as the party opposing summary judgment, and conflicts in the evidence have been resolved in his favor.

### 1. The Parties

Lewis is a gay African American man. (Pl. 4/10/07 Decl. ¶ 31; *see* Pl. H56.1 at 4, 5).[1] He is not Muslim. (Pl. H56.1 at 25).

---

1. "Pl. 4/10/07 Decl." refers to Lewis's declaration dated April 10, 2007, submitted in opposition to the Hospital's motion. "Pl. H56.1" refers to Lewis's response to the Hospital's Rule 56.1 statement of undisputed facts. "Union 56.1" refers to the Union's Rule 56.1 statement. "Pl. 56.1" refers to Lewis's response to the Union's 56.1 statement, which is numbered "33" on the first page. "Pl. Dep." refers to the transcript of Lewis's deposition. "UX," "HX," and "PX" refer, respectively, to the Union's, the Hospital's, and plaintiff's exhibits submitted in support of and in opposition to defendants' motions for summary judgment. "Pl. Resp. to Hosp. Mem." refers to plaintiff's response to the Hospital's memorandum of law. Plaintiff's documents and exhibits are not clearly numbered and hence I have numbered the pages and exhibits consecutively and refer to them by these numbers.

He has been diagnosed in the past with post traumatic stress disorder, obsessive compulsive disorder, and major depression. (*Id.* at 2). He received a Masters in Social Work from Columbia. (*Id.* at 4). He was employed as a social worker by the Hospital from November 29, 2004 until January 18, 2006. (Union 56.1 ¶ 1; Pl. U56.1 ¶ 1; Pl. Dep. 7). During the period immediately preceding and during his employment at the Hospital, Lewis's legal name was Serh Talmadge Farid Efe. (Union 56.1 ¶ 2; Pl. U56.1 ¶ 2; *see* UXs 1, 2, 3; Pl. Dep. 5). On January 20, 2006, Lewis legally reverted to his birth name, Darren Lewis. (Union 56.1 ¶ 3; Pl. U56.1 ¶ 3; UXs 4, 5).

While employed at the Hospital, Lewis was a member of the Union. (Union 56.1 ¶ 4; Pl. U56.1 ¶ 4). The Union is a labor organization within the meaning of § 2(5) of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 152(5), and it is the certified collective bargaining representative of certain employees of the Hospital, which is an employer covered by the LMRA. (Union 56.1 ¶¶ 5, 6; Pl. 56.1 ¶¶ 5, 6). The Hospital is a member of the League of Voluntary Hospitals (the "League"), a multi-employer association, and the Hospital was bound by a collective bargaining agreement (the "CBA") between the League and the Union covering the period of Lewis's employment at the Hospital. (Union 56.1 ¶¶ 7–10; Pl. 56.1 ¶¶ 7–10). The CBA permitted the Hospital to discharge employees for cause. (Union 56.1 ¶ 11; Pl. 56.1 ¶ 11).

### 2. *Lewis Is Hired By The Hospital*

On November 16, 2004, the Hospital extended Lewis a written offer of employment as a "Social Worker" in its HIV/AIDS Special Services Department effective November 29, 2004. (UX 1; *see* Pl. Dep. 16, 18 (Lewis acknowledging he was hired as a "social worker")). The offer letter, which was signed by Lewis (under his then-name of "Serh Efe"), stated that the offer was "contingent" upon, *inter alia,* "professional credentialing." (UX 1). The Hospital's job description for the Social Worker position described the qualifications as "[a] Master's in Social Work from an accredited graduate school of social work with NYS licensure required within one year from date of hire." (UX 28; *see* Pl. Dep. 21). The Hospital's posting for the job vacancy that Lewis filled also noted that "NYS Licensure [was] required within one year from date of hire." (HX 6 at 2; *see* Pl. Dep. 38–40).

On November 22, 2004, approximately eight days before he commenced his employment with the Hospital, Lewis signed a form entitled "Outstanding New Hire Documentation," in which he stated:

> I understand that my employment can be terminated for cause if the following document(s) *CSW/LMSW* is not furnished by *11–30–05.*

(UX 10). The reference to "CSW/LMSW" was to the titles "Certified Social Worker" and "Licensed Master Social Worker," [2] and it was understood that Lewis would have to obtain his license either as a certified social worker or licensed master social

---

2. Generally, social workers—formerly known as "certified social workers"—must be licensed under New York law. *See* N.Y. Education Law §§ 7702, 7704 (McKinney Supp. 2007). Effective September 1, 2004, the term "certified social worker" was replaced by the title "licensed master social worker." *See id.* § 7702 & historical note. A new title, "licensed clinical social worker," was also add-

ed. *See id.* (*See also* HX 7). Section 7702(2) of the Education Law provides that "[o]nly a person licensed or exempt under this article shall practice 'licensed master social work' as defined in subdivision one of section seventy-seven hundred one of this article." N.Y. Education Law § 7702(2) (McKinney Supp.2007); *see id.* § 7706 (setting forth exemptions).

worker by November 30, 2005 or his employment would be terminated. (*See* Pl. Dep. 13, 30–32, 33 (acknowledging that he was required to obtain his state license within one year from date of hire)).

Lewis admitted at his deposition that he signed the document on November 22, 2004. He testified, however, that the original form had the date "11–30–04" written in and that, at his request, the date was changed to "11–30–05" after he signed the document so that he could have more time to obtain the required license. In other words, when he signed the document it stated "11–30–04" but, at his request, the "04" was "whited out" and changed to "05." (*See id.* at 10–11). Lewis acknowledged at his deposition that once this change was made, he agreed and understood that his employment could be terminated if he did not provide the documentation by "11–30–05." (*Id.* at 13).[3]

### 3. *Lewis's Inability To Obtain A License*

Before commencing employment with the Hospital, Lewis had taken the examination to be licensed as a social worker three times—in January 2002, June 2002, and August 2004—and failed each time. (*Id.* at 249–51; UX 12). While employed at the Hospital, he took a review course to prepare to take the social worker licensing examination again, but he withdrew from the course in May 2005 before completing it. (Pl.Dep.35, 121–22, 254–55). He did not take the social worker exam again and made no other efforts after the summer of 2005 to take the exam. (*Id.* at 255). Lewis waited until September 2005 even to inquire of the Hospital what he should do to "fulfill" his obligation to obtain a license.

(*Id.* at 112–13).[4] Lewis did not obtain his social worker license by the deadline of November 30, 2005. (*Id.* at 13; *see also id.* 31–32).

An individual who has met all the requirements to be a licensed master social worker except for passing the examination may obtain a "limited permit" by meeting certain requirements. (HX 7 at 9–10). *See also* N.Y. Education Law § 7705 (McKinney 2004) (requirements for limited permits). Lewis applied for such a limited permit, and he was advised by the State Education Department on October 19, 2005 that his application was "incomplete" because he had not provided "[p]roof of child abuse training from an approved provider." (UX 13; *see* Pl. Dep. 115–16). In fact, Lewis did not have child abuse training from an approved provider at that time, and he did not obtain that training until March 30, 2006, two months after his employment at the Hospital was terminated. (Pl. Dep. 116, 119–20; UX 14). Lewis never obtained a temporary permit. (Pl. Dep.7, 40, 116).

### 4. *Lewis's Complaints*

On December 7, 2005, Lewis filed a verified complaint against the Hospital with the New York State Division of Human Rights (the "State Division"). (HX 11). Lewis complained that he was "perceived to be a Muslim" and was subjected to discrimination because of this. (*Id.* ¶ 1). He complained that he was "rumored" in his department to be a "child molester" and that his co-workers thought he was "not an American" and believed that he was "homophobic" and "racist." (*Id.* ¶ 3). He stated that the Administrative Director

---

3. In his opposition to the summary judgment motions, although he acknowledges that he signed the form and agreed to the revised document, Lewis contends that "the document was no longer valid once white out had been used." (Pl. 56.1 ¶ 15).

4. Lewis testified that he waited until then because he was "being relentlessly harassed and [he] suffered a diagnosis of depression during that period of time and it was difficult for [him] to get the licensing under those conditions." (Pl.Dep.113).

thought he was "Muslim, racist, homophobic and a child molester." (*Id.* ¶ 4). He stated that his supervisor, Valerie Holly, was harassing him by not allowing him to keep doctor's appointments and requiring him to obtain a doctor's note each time he saw his doctor. (*Id.* ¶ 5). He also claimed that he was "denied supervision from Ms. Holly for three weeks." (*Id.*). He made no other mention of Holly.

In his verified complaint, Lewis did not mention any issue of sexual harassment, but alleged only that: "Based on the foregoing, I charge respondent with an unlawful discriminatory practice relating to employment *because of creed,* in violation of the New York State Human Rights Law (Executive Law, Article 15), Section 296." (*Id.* at 2 (emphasis added)).

Lewis also charged a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* without alleging any additional purportedly wrongful conduct. (*Id.*). Lewis authorized the State Division to accept the complaint on behalf of the United States Equal Employment Opportunity Commission (the "EEOC") as well. (*Id.*).

On December 27, 2005, Lewis discussed a number of work issues with his supervisor, Valerie Holly. (UX 15). In an e-mail written the same day to Holly, Lewis acknowledged that Holly had noted that there were issues that would have to be addressed in his "upcoming evaluation." (*Id.*). Lewis made no mention of any sexual harassment issues. (*Id.*).

On January 9, 2006, Lewis sent Holly an e-mail, copying Union delegate Carole O'Connor and the Hospital's Director of Social Work, Linda Torres, stating:

> We discussed the four occurrences [sic] of your person getting close to me where parts of your body was [sic] touching mine. This occurred from October 2005 to December 2005. We have agreed in order to resolve this matter and not let

> it continue you and I will NEVER be in a closed door meeting again because I feel violated.

(UX 16; *see* Carter Decl. ¶ 20). This January 9, 2006 e-mail was the first time Lewis had raised the issue of sexual harassment with anyone. (Pl.Dep.198–99, 202).

### 5. *Lewis's Employment Is Terminated*

By letter dated January 17, 2006, the Hospital advised Lewis that his employment was being terminated "effective immediately" because he had failed to obtain the required New York State social worker certification within one year of employment. (HX 10). The letter noted that Lewis had recently accused his supervisor of sexual harassment, but concluded that, following an investigation, his allegations were "unfounded and frivolous" and were made "as pretext to maintain [his] position with the Hospital despite [his] lack of certification." (*Id.*).

### 6. *Lewis Amends His State Division Charges*

In February 2006, approximately a month after his employment with the Hospital was terminated, Lewis asked the State Division to amend his complaint to include a claim of sexual harassment, based on the four alleged occurrences with his supervisor. (Pl.Dep.67–71, 85–86, 217–21). He also raised the issue of retaliation. (*Id.* at 86).

### 7. *The Grievance Process*

By letter dated January 18, 2006, the Hospital advised the Union that Lewis's employment had been terminated. (UX 17). By letter dated January 20, 2006, the Union advised the Hospital that it would be grieving the termination of Lewis's employment. (Carter Decl. ¶ 13; UX 20).

The same day, the Union wrote to Lewis advising him that if he believed he had grounds to grieve the termination and wanted to do so, he was to advise the Union in writing. (Carter Decl. ¶ 13; UX 18). By letter dated January 27, 2006, Lewis advised the Union that he believed his dismissal was improper and asked to meet with the Union. (Carter Decl. ¶ 15; UX 19).

On February 21, 2006, a grievance meeting was held pursuant to the CBA's grievance procedure. (Carter Decl. ¶ 23). During the meeting, the Hospital presented documentary evidence to show that Lewis had never obtained the required social work licensing. (*Id.*). The Union representative attempted to convince the Hospital to reinstate Lewis despite his lack of proper licensing. (*Id.* ¶ 25). Lewis's claim of sexual harassment was raised but the discussion was not completed and the harassment issue was bifurcated from the licensing issue to be pursued at another time. (*Id.* ¶¶ 23, 24). During the course of the meeting, the Union's representative apparently interrupted Lewis while he was speaking in an effort to keep him focused on the issue being discussed, *i.e.*, the licensing issue. (*Id.* ¶ 26).

By letter dated March 3, 2006, the Hospital advised that it would not reinstate Lewis because the licensing requirement was non-negotiable and had to be met "in accordance with recent changes in the law." (UX 22; *see* Carter Decl. ¶ 28). Therefore, the letter advised, the Hospital was adhering to its decision to terminate Lewis's employment. (UX 22).

The Union thereafter scheduled a meeting for April 4, 2006 to discuss the unresolved part of Lewis's grievance—his sexual harassment claim. (Carter Decl. ¶ 29; UX 23). On March 9, 2006, however, Lewis advised his Union representative that he did not want to continue the second part of his grievance. He then asked that the

grievance be canceled entirely. The Union asked Lewis to put his request in writing. (Carter Decl. ¶ 30). Lewis did not do so, and the Union representative called Lewis on April 3, 2006 to discuss the grievance and arbitration procedures. (*Id.* ¶ 31). The Union representative followed with a confirming letter. (UX 23).

The grievance meeting to address Lewis's sexual harassment claim was re-scheduled to May 18, 2006. The meeting was held. The Hospital stated that it had investigated the allegations and found them to be untrue; it stated that the allegations were a pretext created by Lewis to avoid discharge for failing to obtain a license. The Hospital denied the grievance in its entirety. (Carter Decl. ¶¶ 34–36).

The Union declined to arbitrate Lewis's grievance because "there was little likelihood of success." (*Id.* ¶ 38). Lewis was advised of the decision and his right to appeal the decision not to arbitrate. (*Id.* ¶ 39). Lewis did not file an appeal, but nonetheless the Union scheduled a meeting of its Health Systems Division Hearings and Appeals Board (the "Board") to consider whether the grievance should be arbitrated. (*Id.* ¶ 43). The Union advised Lewis by letter dated September 27, 2006 that his case would be heard on October 18, 2006 at 6 p.m. (UX 26). The hearing was held as scheduled, but Lewis did not appear nor did he give an explanation for his absence. The Board voted to uphold the Union's decision not to arbitrate the grievance and Lewis was so notified in writing. (*Id.* ¶¶ 44, 45; UX 24).

### 8. *The State Division's Decision*

On March 13, 2006, the State Division issued its Determination and Order after Investigation. (HX 15). The State Division determined that there was no probable cause to believe that Lewis had been discriminated against. (*Id.*). The State

Division noted that the Hospital had terminated Lewis's employment when he had failed to obtain his social worker certification by January 17, 2006. (*Id.*). It concluded that there was "no evidence" to support Lewis's allegations of sexual harassment. (*Id.*). It concluded that the Hospital had shown legitimate, non-discriminatory reasons for its actions, which were not shown to be pretextual. (*Id.*). Accordingly, Lewis's complaint was dismissed. (*Id.*).

The State Division advised Lewis that he could appeal to the New York State Supreme Court within sixty days after service of its Determination. (*Id.*). It also advised Lewis that he could seek a review with the EEOC by making a written request for a review with the EEOC within fifteen days of his receipt of the Determination. (*Id.*).[5]

### 9. *Proceedings in the EEOC*

Lewis apparently did seek review from the EEOC. (Pl. Resp. to Hosp. Mem. at 13). On May 1, 2006, the EEOC issued a decision dismissing Lewis's charge because it was adopting "the findings of the state or local fair employment practices agency that investigated this charge." (PX 5).

### B. *Prior Proceedings*

Lewis commenced this action against the Hospital and the Union by filing a summons and complaint *pro se* in the Supreme Court of the State of New York, New York County, on May 31, 2006. (HX 1). The complaint lays out Lewis's version of the facts and asserts claims for sexual harassment, wrongful termination, breach of contract, and defamation. (*Id.*). At his deposition, Lewis testified that his claims in this case are the same as those asserted in his State Division complaint. (Pl.Dep.137).

On June 26, 2006, the Union removed the case to this Court on the basis that Lewis was essentially suing the Union for breach of its duty of fair representation under the CBA, a claim governed by the LMRA. (UX 9).

The parties conducted extensive discovery. Plaintiff took twelve depositions himself. (Rosenthal 2/20/07 Decl. ¶ 4). These motions followed. Plaintiff submitted lengthy responses to both motions.[6]

### DISCUSSION

I address first Lewis's claims against the Hospital and second his claims against the Union.

### A. *Claims Against the Hospital*

Liberally construed, Lewis's complaint asserts claims against the Hospital for (1) breach of contract, (2) defamation, (3) discrimination, including both "perceived religion" discrimination and sexual harassment, and (4) retaliation. I discuss each claim in turn.

### 1. *Breach of Contract*

█ No reasonable jury could find on the record before the Court that the Hospital breached any contract with Lewis.

---

5. On June 1, 2006, Lewis sued the State Division in the Supreme Court, New York County, seeking $1 million in damages for breach of contract, negligence, and intentional infliction of emotional distress, based on the State Division's dismissal of his discrimination charge in this case. (HX 17).

6. Much of what Lewis submits would be inadmissible at trial. For example, he submits: excerpts from books such as *Pedagogy of the Oppressed* and *The Twelve Essential Laws For Becoming Indispensable;* his reflections on whether America has changed "post 9/11"; a quote from a 1970s actress; his aspirations when younger to be a news reporter, a singer, and a lawyer; and a sociological study showing that gay men are more likely to use recreational drugs. (Pl. 4/10/07 Decl. ¶¶ 31, 32, 33, 35 & 37).

First, any claim that the Hospital breached the CBA is precluded because, as discussed below, the Union did not breach its duty of fair representation to Lewis. A union's breach of its duty of fair representation is a prerequisite to an employee's claim against his former employer for wrongful discharge in breach of a collective bargaining agreement. *See Young v. United States Postal Serv.*, 907 F.2d 305, 307 (2d Cir.1990) ("The threshold issue . . . is whether the district court was correct in holding that the Union had not breached its duty of fair representation to plaintiff. If we affirm that ruling, that ends the appeal because the Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against her former employer for improper discharge.") (citation omitted). Hence, Lewis's breach of contract claim against the Hospital is barred.

Second, the Hospital had the right under the CBA to dismiss an employee for cause in any event, and here the Hospital had good cause to discharge Lewis because he did not obtain the required New York State licensing (or a temporary permit) within one year of hire. Lewis's obtaining of a social worker license within a year of his hire was an express condition of his continued employment with the Hospital. Lewis understood this, and he signed the Outstanding New Hire Documentation form acknowledging that his employment could be terminated for cause if he did not obtain the license by November 30, 2005. (UX 10). The licensing requirement was referred to in his offer letter (UX 1 ("professional credentialing")), his job description (HX 5), and the vacancy listing (HX 6). His performance evaluation, which he signed on June 20, 2005, reminded him that he needed to "[a]chieve licensure as a

NYS Licensed Master of Social Work by November 29, 2005." (HX 8 at 8).[7]

Yet, Lewis failed to obtain the license or a temporary permit. Under these circumstances, a reasonable jury could only conclude that the Hospital discharged Lewis on January 17, 2006, well after the deadline, for good cause.

Third, to the extent that Lewis is somehow claiming that the Hospital breached the CBA or any other contract because his supervisor sexually harassed him, the claim is rejected as a matter of law as well, for the reasons discussed below.

### 2. *Defamation*

■ To recover for slander under New York law, a claimant must prove: (1) a defamatory statement of fact, that is (2) false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) causing special harm or constituting slander per se, and (7) not protected by privilege. *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir.2001) (citation omitted). Words are actionable only if they are "reasonably susceptible of defamatory meaning." *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 280 (S.D.N.Y.2006) (citation omitted).

■ Lewis appears to be alleging that he was defamed because he was perceived by co-workers to be a racist, homophobic, a child molester, and a Muslim. (*See* HX 11). His own deposition testimony, however, demonstrates that his defamation claims fail as a matter of law:

Q Could you please explain what you mean when you allege defamation of character?

---

**7.** Nor does the fact that the outstanding documentation form was changed from a deadline of "11/30/04" to "11/30/05" provide Lewis with any support. The change was made for his benefit and, indeed, at his request. He was obliged to obtain his licensing within a year.

A Me being perceived as a Muslim.

Q Anything else?

A Child molester, homophobic, and racist against white people.

Q Anything else?

A No.

(Pl.Dep.139).

Lewis then explained the basis for each of the claims of defamation, beginning with his assertion that he was defamed because he was perceived as being racist:

Q Let's start with your statement that you believe it was defamatory when you were accused of being racist against white people.

Who made that accusation against you?

A Valerie Holly.

Q When did she make that allegation against you?

A Throughout the year 2005.

Q What did she say to you?

A It's not what she said, it's what she did.

Q Did she say anything to you—I'm not talking about what she did, I'm talking about what she said—did she say anything to you about your being racist against white people?

A Did she say those words, no.

(*Id.* at 139–40). Lewis explained that Holly said or did things as a "covert" way of waiting to see his response, and that this somehow defamed him. The only specific examples he gave were that Holly waited to see his response when she (1) told him that another employee had been given a preference because he was white and (2) she took all of his Caucasian clients off his case load. (*Id.* at 140–42).

These are not defamatory statements of fact, nor are they "of and concerning" the plaintiff. The first, even coupled with waiting to see his response, is not a statement about Lewis but is instead a statement about a co-worker. Nor is there any suggestion that the statement was published to a third party, that is, that it was made to anyone other than Lewis himself. The second example is not a statement at all and clearly does not constitute defamation.

As for the allegation that he was defamed because he was accused of being homophobic, Lewis testified that he could not remember anyone at the Hospital calling him or referring to him as being homophobic. (*Id.* at 142). Hence, this allegation is wholly unsupported and cannot be the basis for a claim of defamation.

■ Likewise, Lewis acknowledged at his deposition that no one at the Hospital accused him of being a child molester, but he testified that two employees implied that he was a child molester by referring, in his presence, to Michael Jackson or "some African man who had molested a child." (*Id.* at 144). He testified that he was not "an African man." (*Id.*). No reasonable jury could conclude, however, that comments to Lewis about Michael Jackson or an "African man" implied that Lewis was a child molester. In any event, these are not statements of fact concerning Lewis, and he does not allege that they were published to a third party.

■ Finally, Lewis testified that a co-worker defamed him by commenting to him that one of his names—Talmadge—was the name of someone associated with Malcolm X:

Q Did you think that Ms. Bundy telling you about your name Talmadge was defamatory?

A I think it was her perception of the name Talmadge being connected with Malcolm X. Putting me in that category is defamatory.

Q How so?

A  Because I'm not connected with Malcolm X. I'm not connected with Muslims. Talmadge is not a Muslim name. I made it very clear in '94 when I changed my name that I did not want to be associated with that religion.

Q  Did Ms. Bundy accuse you of being a Muslim?

A  In that instance, yes.

Q  What did she say?

A  She said Talmadge is connected with Muslim.

Q  Did anybody ever ask you whether you were Muslim?

A  These are implications made all over the place, not knowing me at all.

None of these people know who I am but they are making implications all over the place, waiting for my response, who they think it's an African person.

My own people, it's distressing.

Q  What do you mean, your own people?

A  African–American people coming to me with this information.

It's terrible.

Q  Would it have been okay if it had been white people who said this to you?

A  No, it wouldn't.

Q  But it's worse that it's your own people as you say?

A  Thank you. Thank you.

(*Id.* at 146–47; *see also* HX 9 (plaintiff's chronology)).

The statement that the name "Talmadge" was somehow connected to Malcolm X is simply not a defamatory statement of fact concerning Lewis, and no reasonable jury could conclude otherwise. Moreover, no reasonable juror could find that the statement that someone named Talmadge was connected to Malcom X implied that Lewis was Muslim. Nor could

an implication that Lewis was Muslim, in this context, even be defamatory. Finally, again, Lewis has failed to allege that the statement was published to any third party.

For all these reasons, Lewis's defamation claims fail as a matter of law.

### 3. *Discrimination*

■  To the extent Lewis asserts discrimination (including harassment) claims under New York state law, the claims are barred by the doctrine of election of remedies, for he filed his verified complaint with the State Division, which dismissed the complaint on the merits and not on the grounds of administrative convenience. As the New York State Executive Law provides:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... unless such person had filed a complaint hereunder or with any local commission on human rights, ... provided that, where the division has dismissed such complaint on the grounds of administrative convenience, ... such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Executive Law § 297(9) (McKinney 2005); *see Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir. 2000).

Nonetheless, the election of remedies doctrine does not preclude Lewis from pursuing any claims he might have under Title VII. Although Lewis's complaint in this Court does not cite Title VII, because his verified complaint in the State Division did cite Title VII and because the EEOC considered his claims, I consider his discrimination claims on the merits under Title VII.

At his deposition, Lewis acknowledged that the Hospital did not discriminate against him because of race, gender, religion, or sexual orientation. (Pl. Dep. 96–97; *see also id.* 78–80). Nor did he contend that he had been discriminated against because of any disability. (*Id.* at 196). Rather, he testified only that he was discriminated against because of his "[p]erceived creed"—the Hospital's "perception" that he was Muslim. (*Id.* at 78–79, 97). Despite the acknowledgment that he was not discriminated against because of his gender, he also alleges a sexual harassment claim based on the four alleged instances of inappropriate touching. (*See id.* at 196). Accordingly, I discuss the "perceived creed" discrimination claim and the sexual harassment claim on the merits.

### a. *Perceived Creed or Religion Discrimination*

■ Lewis's claim that he was discriminated against in violation of Title VII because of his "perceived creed" or "perceived religion" must be dismissed, for at least two reasons.

First, as discussed above, Lewis has not articulated a factual basis for any "perceived religion" claim. He speculates that a co-worker implied that he was Muslim because she commented to him that someone with the name "Talmadge" had been affiliated with Malcolm X.[8] But no reasonable jury could conclude that this comment, even if it was made, implied that Lewis was Muslim. Moreover, even if it did imply that he was Muslim, at worst this would be a stray remark that would not, without more, constitute evidence of discrimination. *See Silver v. North Shore*

*Univ. Hosp.*, 490 F.Supp.2d 354, 362–63 (S.D.N.Y.2007).

Second, the "perceived religion" claim also fails as a matter of law, for the protections of Title VII do not extend to persons who are merely "perceived" to belong to a protected class. *See Uddin v. Universal Avionics Systs. Corp.*, No. 05 Civ. 1115(TWT), 2006 WL 1835291, at **5–6 (N.D.Ga. June 30, 2006) ("Title VII does not explicitly protect persons who are *perceived* to belong to a protected class.") (emphasis in original); *Butler v. Potter*, 345 F.Supp.2d 844, 850 (E.D.Tenn.2004) ("Title VII protects those persons that belong to a protected class, . . . and says nothing about protection of persons who are *perceived* to belong to a protected class.") (emphasis in original; internal citation omitted); *see also Berrios v. Hampton Bays Union Free Sch. Dist.*, No. 02 Civ. 3124, 2007 WL 778165, at *1 (E.D.N.Y. Mar.12, 2007) (noting absence of Supreme Court or circuit court precedent for "perceived religion" claim under Title VII, but deciding to put such claim to jury to permit appellate review). In the Americans with Disabilities Act, Congress provided for claims based on a "perceived" disability or being "regarded as" having a disability. *See Butler*, 345 F.Supp.2d at 850. If Congress had wanted to permit a similar cause of action under Title VII for "perceived religion" discrimination, it could have so provided. It did not.

### b. *Sexual Harassment*

Sexual harassment claims generally fall into two categories: *quid pro quo* claims, which involve "a threat which is carried

---

8. Lewis also testified at his deposition that a security guard at the Hospital hit him in the shoulder. He speculated that this happened because the security guard thought he was Muslim, but he acknowledged having no evidence that the security guard perceived him to be Muslim. (Pl.Dep.178–80).

Lewis acknowledged at his deposition that his supervisors never made any comments to him about his name or his being Muslim or any perceived creed. (*Id.* at 100–01, 108–10).

out," and hostile environment claims, which involve "offensive conduct in general." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir.2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); *see also Schiano v. Quality Payroll Systs., Inc.*, 445 F.3d 597, 603–04 (2d Cir.2006). Here, Lewis has not asserted a *quid pro quo* claim, for he has not alleged that he was subjected to any threats, nor has he claimed that he was subjected to adverse employment action because of his refusal to submit to sexual advances. Rather, Lewis complains that he was subjected to four alleged instances of improper physical contact by a supervisor. Hence, I analyze the claim as a hostile environment claim.

### i) *Applicable Law*

■ To prevail on a hostile work environment claim under Title VII, "a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004) (internal quotations and citations omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (to defeat summary judgment motion on hostile environment claim, "plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal quotation marks omitted). Second, a hostile work environment claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999). If not based on a plaintiff's membership a protected class, abusive conduct in the workplace is not actionable under Title VII. The statute prohibits discrimination based on certain protected classes, and it is not a general code of civility. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Finally, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).

The first element has both a subjective and an objective component. The victim must subjectively perceive the environment to be abusive, but the misconduct must also be sufficiently severe or pervasive to create an objectively hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To determine whether conduct is objectively severe or pervasive, the court must consider the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 21, 23, 114 S.Ct. 367; *see also Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir.2004). Conduct is not sufficiently severe or pervasive if it does not alter the conditions of employment. As the Second Circuit has recognized:

> Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir.2004).

### ii) *Application*

Summary judgment is granted in favor of the Hospital dismissing Lewis's sexual

harassment claim, for two reasons. First, even assuming the incidents occurred as Lewis alleges, no reasonable jury could find that the misconduct was so severe or pervasive as to be objectively hostile or abusive. Second, even assuming the conduct was severe or pervasive, Lewis does not allege that the misconduct was directed at him because of his gender.

### A. Severe or Pervasive Conduct

■ No reasonable jury could find that the alleged misconduct was sufficiently severe or pervasive, for the following reasons:

First, Lewis identifies only four incidents over a three-month period as the basis for his sexual harassment claim: he alleges that on four occasions during October, November, and December 2005 his supervisor brushed up against him. (Pl. Dep. 126–27, 202; HXs 13, 14, 15). In a written description of the four incidents, he describes the first incident as "accidental[ ]." (HX 13). Hence, only three incidents are really at issue. He alleges no other instances of unwelcome sexual contact or conduct. (See Pl. Dep. 202–03).

Second, the three (or four) alleged incidents were not objectively severe. In his e-mail to his supervisor of January 9, 2006, when he first accused her of sexual harassment, he described the incidents as "your person getting close to me where parts of your body was [sic] touching mine." (HX 14). When he finally alleged to the State Division that he had been sexually harassed, he claimed only that his supervisor had "brushed up against him on four occasions between October 2005 and December 2005." (HX 15). He acknowledged at his deposition that this was a "correct statement" of what he told the State Division. (Pl.Dep.126–27). He did not allege, either in his e-mail to his supervisor or his statement to the EEOC, that the supervisor had rubbed her breast on him. It was

only in his written chronology of the four incidents that he claimed that the supervisor stood so close that she "rubbed her breast on me." (HX 13). Certainly under the first interpretation ("brush[ing] up against him"), and even under the second (standing so close to him that her breast rubbed against him), the incidents simply were not objectively severe.

Third, even accepting Lewis's description of his reaction, his own words show that subjectively he did not find the conduct to be physically threatening or humiliating. He wrote that the contact "seemed and felt strange," and he expressed puzzlement at why the supervisor got so close to him. (HX 13). He wrote that "[t]his woman is a freak" and "[t]his woman is disgusting," but he did not, in his written chronology of the four incidents, claim that he suffered any psychological or emotional impact. (Id.). In his January 9, 2006 e-mail complaining about the four incidents, he did not complain of any psychological or emotional reaction other than to write that he would never be in a "closed door meeting" with the supervisor again "because I feel violated." (HX 14).

Fourth, no reasonable jury could find that the three or four incidents of inappropriate conduct could have unreasonably interfered with Lewis's work performance. In fact, Lewis did not even report the alleged sexual harassment until January 9, 2006, some three weeks after the last of the four incidents. (Pl.Dep.198). He did not mention the subject of sexual harassment at all in the verified complaint he submitted to the State Division on December 7, 2005, even though three of the four incidents allegedly had occurred before then. (HXs 11, 13). He complained in the verified complaint that the supervisor in question had harassed him by not allowing him to keep doctor's appointments and requiring him to provide doctor's notes, and yet he did not mention that she pur-

portedly had sexually harassed him by rubbing her breast against him. (HX 11 ¶ 5). In a nine-page detailed chronology that he wrote describing numerous incidents during his employment at the Hospital, he makes no mention of the four alleged incidents of his supervisor brushing up against him or rubbing her breast on him, even though he complained about the same supervisor in many entries not involving physical contact. (HX 9; *see* Pl. Dep. 33).[9] Hence, Lewis's actions show that the alleged conduct did not have much of an impact on him.

Finally, Lewis's e-mail shows that the matter had been resolved to his satisfaction, as he wrote: "We have agreed in order to resolve this matter and not let it continue you and I will NEVER be in a closed door meeting again because I feel violated." (*Id.*). The State Division likewise construed the statement as an indication that Lewis believed "the matter was resolved." (HX 15 at 2).

From these undisputed facts, and in light of the totality of the circumstances—including Lewis's overreaction to statements of co-workers, including his irrational conclusion that a passing reference to Michael Jackson implied that he was a child molester and that a passing comment that a white employee had been given a preference implied that he was racist, and Lewis's knowledge that his employment was likely to soon be terminated because of his inability to obtain the required social worker's license—a reasonable jury could only conclude that the three (or four) incidents did not have such an impact on

Lewis as to change the conditions of his employment to the extent where objectively there was a hostile work environment.

### B. *Gender Discrimination v. Sexual Conduct*

■ Even assuming there was an objectively hostile or abusive work environment, for Title VII to apply, Lewis must show that the misconduct occurred because of his membership in a protected class. *See Brennan*, 192 F.3d at 318. He has failed to do so.

As Lewis has acknowledged, he is gay and the supervisor in question, a woman, is also gay. (Pl.Dep.28–29, 200). He has not alleged anywhere that the alleged misconduct was directed at him because of his gender, and, to the contrary, he disavowed at his deposition that he had been discriminated against or harassed because of his gender. (*Id.* at 78–80, 96–97). Even assuming the supervisor brushed up against him and rubbed her breast against him, he does not contend that this happened because of his gender. He does not allege anywhere—not in his written description of the four incidents or in his January 9, 2006 e-mail or in his statements to the State Division or in his voluminous submissions to this Court—that his supervisor was making a sexual advance toward him or that the supervisor brushed up against him because he was a man. *See, e.g., Simonton v. Runyon*, 232 F.3d 33, 36 (2d Cir.2000) (interpreting *Oncale* as permitting same-sex harassment claim as long as plaintiff could show that he was harassed "because he was male").[10] On this record,

---

**9.** Rather, inexplicably the four incidents are listed in a separate chronology, which contains no other entries, even though entries appear in both documents for all four dates in question. (HXs 9, 13).

At his deposition, Lewis also testified that when each incident happened, he asked Holly what she was doing and "her response always was, oh, excuse me." (Pl.Dep.202). He nev-

er told her during any of the incidents he believed she was engaging in sexual harassment. (*Id.*).

**10.** In a slightly different context, Lewis testified that the supervisor in question yelled and screamed at him because of his perceived religion or creed. When asked why he believed that, Lewis responded: "You know, I cannot get in Valerie's mind. I don't know

then, a jury would have to speculate as to the supervisor's motivation—if any—in brushing up against Lewis. A reasonable jury could not find that, more likely than not, the supervisor brushed up against Lewis "because he was male."

Of course, if the incidents were accidental—if there was no motivation—they would not be actionable under Title VII. To the extent Lewis suggests that the supervisor rubbed up against him because of his sexual orientation—to tease him, perhaps, because of his sexual preferences—the conduct still would not be actionable under Title VII, for it is well settled that Title VII does not protect against discrimination based on sexual orientation. *See, e.g., id.* at 35 ("The law is well-settled in this circuit and in all others to have reached the question that ... Title VII does not prohibit harassment or discrimination because of sexual orientation."). Finally, to the extent that Lewis is alleging that the supervisor was intentionally engaging in sexual—as opposed to gender-based—conduct, again he cannot find recourse in Title VII, for the statute is not a general bar of sexual conduct. *See Martin v. New York State Dep't of Correctional Servs.,* 224 F.Supp.2d 434, 447 (N.D.N.Y.2002) (granting summary judgment dismissing sexual harassment claim in part because "[t]he name-calling, the lewd conduct and the posting of profane pictures all are of a sexual, not gender, nature"); *see also Simonton,* 232 F.3d at 36 (holding that, for purposes of Title VII, " 'sex' refers to membership in a class delineated by gender").[11] Indeed, because Lewis has not alleged "a basis for inferring

gender-based animus," a reasonable jury would be "unable to infer that the alleged conduct would not have been directed at a woman." *Id.* at 37 (affirming dismissal of sexual harassment claim brought by male plaintiff). *Cf. Petrosino,* 385 F.3d at 221–23 (holding that hostile work environment that exposed both men and women to sexually offensive circumstances could still support hostile environment sexual harassment claim if circumstances were "more demeaning of women than men").

Accordingly, Lewis's sexual harassment and discrimination claims are dismissed.

### 4. *Retaliation*

Title VII prohibits an employer from firing or otherwise discriminating against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). Thus, Title VII's "participation clause" protects participation in a proceeding under Title VII. *See Deravin v. Kerik,* 335 F.3d 195, 203 n. 6 (2d Cir.2003). Further, "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.' " *Terry v. Ashcroft,* 336 F.3d 128, 140–41 (2d Cir.2003) (citation omitted).

■ To establish a *prima facie* case of retaliation, Lewis must show that (1) he was engaged in protected activity; (2) the Hospital was aware of that activity; (3) he suffered an adverse employment action;

---

why she did these things.... I really don't know." (Pl.Dep.108–09).

**11.** Of course, conduct can still be repugnant or improper even though it is not prohibited by Title VII. *See Simonton,* 232 F.3d at 35 (noting conduct was "morally reprehensible," even though it was not proscribed by Title

VII). Here, the Hospital's sexual harassment policy "prohibits harassment of a gay man by a gay woman," and the policy is enforced "without regard to sexual orientation." (Ray 5/21/07 Decl. ¶ 3). Hence, the Hospital's policy provides protections beyond those required by Title VII.

and (4) there was a causal connection between the protected activity and the adverse action. *Id.; accord Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172–73 (2d Cir.2005).

■ A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000) (citation omitted); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). Close temporal proximity can be enough to show causation, and the Second Circuit has held sufficient a "mere twelve day" period between complaint and discharge. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996). On the other hand, close temporary proximity will not salvage a retaliation claim where the facts—including, for example, where the adverse employment action is initiated before the protected activity occurs—dispel any notion of retaliation. *See, e.g., Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 312–13 (S.D.N.Y.2000) (suspension two days after complaint to State Division insufficient to establish retaliation where steps toward discipline were taken before complaint); *Zeigler v. Marriott Int'l, Inc.*, No. 03 Civ. 7688(RWS), 2005 WL 1022431, at *15 (S.D.N.Y. May 2, 2005) (discipline one day after plaintiff filed discrimination charge insufficient where written warnings were issued prior to filing of charge and subsequent discipline was consistent with prior warnings); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir.1997) (discharge of plaintiff three days after supervisors learned plaintiff had contacted civil rights lawyer did not create issue of fact as to employer's motive, where plaintiff had been told earlier that he was going to be fired).

Although a plaintiff's burden at the *prima facie* stage is *de minimis*, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer retaliatory intent. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).

Once a plaintiff establishes a *prima facie* case of retaliatory discharge, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its employment decision. *Jute*, 420 F.3d at 173; *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir.2002). If the employer makes this showing, the burden shifts back to the plaintiff to prove that the employer's explanation is pretextual and that the employer intentionally retaliated. *Jute*, 420 F.3d at 173; *Treglia*, 313 F.3d at 721.

Lewis has not proffered competent evidence from which a reasonable jury could find that he was discharged in retaliation for filing his charge of discrimination with the State Division on December 7, 2005 or for sending an e-mail to supervisors on January 9, 2006 complaining of sexual harassment. Although he has presented evidence to establish the first three elements of his *prima facie* case, he has not presented sufficient evidence from which a reasonable jury could find a causal link between his protected activity and his discharge. Indeed, the indisputable facts show that the Hospital terminated Lewis's employment for a legitimate, non-discriminatory business reason—he did not obtain the required New York State social worker's license within one year of hire. A license was required by New York law, and a New York license was explicitly made a condition of his continued employment. As discussed above, Lewis agreed and clearly understood when he was hired that he would have to obtain the license within a year or the Hospital could termi-

nate his employment for cause. He failed to obtain that license (or a limited permit) and therefore he could not continue to do the work of a licensed master social worker.

Lewis also has failed to point to any direct evidence of a retaliatory animus. Indeed, all that he can point to is the circumstantial evidence of the timing and sequence of events—his employment was terminated about five weeks after he filed his verified complaint with the State Division and about a week after he sent his e-mail complaining of sexual harassment. In light of all the circumstances, however, including the fact that the licensing issue was raised with Lewis when he was hired—long before he complained of discrimination to the State Division and well before he sent his e-mail to his supervisors complaining of sexual harassment—the temporal proximity is not sufficient to permit the retaliation claim to withstand summary judgment.

**B. Claims Against the Union**

Although Lewis does not cite a statutory basis for his claims against the Union, he apparently is asserting a claim for breach of the duty of fair representation under § 301 of the LMRA, 29 U.S.C. § 185.

■ In an action under § 301 of the LMRA, a plaintiff must establish both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation to the union members. *White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001); *see DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) ("the two claims are inextricably interdependent").

A union's duty of fair representation obligates it "to represent fairly all employees subject to the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.

1998). The duty "derives 'from the union's statutory role as exclusive bargaining agent.'" *Agosto v. Corr. Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 303 (S.D.N.Y.2000) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)).

■ A breach of the duty of fair representation claim requires a plaintiff first to show that the union failed in at least one of the three components of the duty: (1) "to serve the interests of all members without hostility or discrimination toward any," (2) "to exercise its discretion with complete good faith and honesty," and (3) "to avoid arbitrary conduct." *O'Neill,* 499 U.S. at 76, 111 S.Ct. 1127 (quoting *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). Second, the plaintiff must show causation, that is, that the union's conduct "'seriously undermine[d] the arbitral process.'" *Barr v. United Parcel Serv., Inc.,* 868 F.2d 36, 43 (2d Cir.1989) (alteration in original; citations omitted).

Courts have fleshed out the three components of the duty of fair representation. The discrimination component refers to that which is "invidious" or "unlawful." *O'Neill,* 499 U.S. at 81, 111 S.Ct. 1127. To show bad faith, there must be "fraud, deceitful action or dishonest conduct." *Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). The actions of a union "are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (citations omitted). In the grievance context, "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Barr,* 868 F.2d at 43. Although

"a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," there is no "absolute right to have [a] grievance taken to arbitration." *Spellacy*, 156 F.3d at 128 (citations omitted).

■ Here, Lewis's claims against the Union are barred because he cannot show that the Hospital breached the CBA; indeed, the Court has held as a matter of law above that the Hospital discharged Lewis for cause—his failure to obtain the required New York social worker license within a year. Hence, Lewis's claims against the Union are precluded on this basis alone. Even assuming, however, that genuine issues of fact exist as to whether the Hospital had cause to terminate Lewis's employment, his claims against the Union fail on the merits as well.

No reasonable factfinder could conclude that the Union breached its duty of fair representation to Lewis. The Union filed a grievance contesting the termination immediately upon being notified that Lewis had been discharged. (UXs 2, 20). The Union promptly scheduled a meeting in accordance with the grievance procedures, met with Lewis to prepare for the meeting, and represented him at the meeting. (Carter Aff. ¶¶ 13, 16, 23–25; UXs 21, 27; Pl. Dep. 320). The issues were bifurcated, and the Union represented Lewis at the second grievance meeting as well. (Carter ¶¶ 24, 29–32).

Moreover, as a practical matter, there was little the Union could do for Lewis, for the Hospital's evidence that it discharged Lewis for cause was overwhelming—the documents, including documents signed by Lewis, showed that he was hired with the express understanding that he was required to obtain a New York license within a year, and he failed to do so. Nor could the Union even argue mitigating circumstances, for the November 2005 deadline had been exceeded by many weeks, and the license was required by New York law. No reasonable factfinder could conclude that any of the Union's actions were unreasonable—much less invidious, unlawful, fraudulent, dishonest, arbitrary, or irrational. *See Spellacy*, 156 F.3d at 128 (union need not pursue grievance that would be, in its estimation, "fruitless").

Nor can Lewis reasonably argue that the Union breached its duty of fair representation by refusing to take his grievance to arbitration. In light of all the circumstances, there was no reasonable, good faith basis for the Union to take the matter to arbitration. Moreover, Lewis failed to avail himself of the Union's internal procedures to pursue arbitration; he had the right to appeal the Union's decision not to arbitrate, a hearing was held, and he failed to appear for his own hearing. Hence, Lewis did not exhaust his internal remedies, and he has shown no basis for waiving the exhaustion requirement. *See Clayton v. Int'l Union*, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981).

Finally, to the extent that Lewis purports to assert breach of contract, discrimination, or retaliation claims against the Union as well, these claims are all without merit, for the reasons set forth above.

### CONCLUSION

Defendants' motions for summary judgment are granted in all respects. The complaint is dismissed with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.