**Daniel ALBERT, Plaintiff,**

v.

**CITY OF HARTFORD,
et al., Defendants.**

**No. 3:03 CV 1280(DJS).**

United States District Court,
D. Connecticut.

Dec. 21, 2007.

---

**314**

Norman A. Pattis, Bethany, CT, for Plaintiff.

Helen Apostolidis, Corporation Counsel's Office, Hartford, CT, for Defendants.

### MEMORANDUM OF DECISION

DOMINIC J. SQUATRITO, District Judge.

The Plaintiff, Daniel Albert ("Albert"), a police officer with the Hartford Police Department ("HPD"), brings this five count action against the City of Hartford ("City Defendant"), various members of the HPD ("Individual Defendants"), and the City Defendant and the Individual Defendants, together ("Defendants"), for the alleged wrongful demotion, suspension and retaliation that he suffered.

Albert filed the Original Complaint on July 24, 2003, alleging (1) violation of the Fourteenth Amendment Right to Equal Protection, as to the Defendants; (2) violation of the Fourteenth Amendment Right to Procedural and Substantive Due Process, as to the Defendants; and (3) violation of 42 U.S.C. § 1983, as to the City Defendant. On June 30, 2004, Albert filed an Amended Complaint alleging two additional causes of action, (4) intentional infliction of emotional distress, as to the Defendants; and (5) violation of the First Amendment Right against retaliation, as to the Individual Defendants. The Individual Defendants named in Count Five are Hartford Police Chief Bruce Marquis ("Chief Marquis"), Hartford Police Assistant Chief Kevin Jones ("Assistant Chief Jones"), Hartford Police Assistant Chief William Reilly ("Assistant Chief Reilly"), Hartford Police Captain Stephen Heslin ("Captain Heslin"), Hartford Police Captain Katherine Perez ("Captain Perez"), Hartford Police Lieutenant David Kenary ("Lieutenant Kenary"), Hartford Police Captain Mark Pawlina ("Captain Pawlina"),[1] and Interim City Manager Albert Ilg ("Manager Ilg").[2]

On August 5, 2004, the Defendants filed an Answer to the Amended Complaint denying liability on all counts and asserting the special defenses of failure to state a claim upon which relief can be granted, qualified immunity, lack of jurisdiction and the failure to exhaust administrative remedies.[3] On September 20, 2004, the Defen-

---

**1.** The parties concur that there is no record of Captain Pawlina being served. Accordingly, all claims against Captain Pawlina are **DISMISSED.**

**2.** Manager Ilg was the Interim City Manager from December 12, 2001, through August 31, 2002.

**3.** The Defendants memorandum of law argues the doctrine of qualified immunity as a special defense and mentions the exhaustion of remedies and lack of jurisdiction in a footnote to Count Five. The Defendants have not briefed the failure to state a claim upon which

dants filed a motion for summary judgment (dkt.# 58) as to the entire Amended Complaint, a memorandum (dkt.# 59), a local rule 56(a)(1) statement (dkt.# 60), and the affidavit of Colleen Kenton ("Kenton") (dkt.# 61). On December 6, 2004, Albert filed a memorandum in opposition (dkt.# 69) to the Defendants' motion for summary judgment. The Defendants filed a reply to Albert's memorandum in opposition to the motion for summary judgment on December 30, 2004. Further, on December 30, 2004, the Defendants submitted a motion to strike (dkt.# 75) portions of the evidence that Albert submitted along with his opposition to the motion for summary judgment.[4] For the following reasons, the Defendants' motion for summary judgment (dkt.# 58) is **GRANTED in part** and **DENIED in part.**

## I. FACTS

This case concerns Albert's promotion to lieutenant, demotion to sergeant, transfer to detention, and various other events that he claims to have suffered as a result of filing the instant lawsuit. Albert, a white male, was promoted to the rank of police lieutenant by Chief Marquis on May 27, 2001.[5] The terms of Albert's promotion were governed by equal opportunity policies, including, the Charter of the City of Hartford ("the Charter"), the City of Hartford Personnel Rules and Regulations ("Personnel Rules"), and the collective bargaining agreement between the City of Hartford and the Hartford Police Union ("the CBA"). In accordance with the Personnel Rules, an officer who is promoted enters a "probationary or working test

relief can be granted. Accordingly, this argument will not be considered by the court.

4. The Defendants have moved to strike nine portions of the evidence submitted by Albert. The Defendants assert that, (1) exhibits 6 and 7 should be stricken because they contain inadmissible hearsay; (2) paragraphs 5 and 6 and portions of paragraphs 1, 9, and 11 of Albert's affidavit should be stricken because they are not based on personal knowledge; (3) Albert's denials to paragraphs 26, 32, 43, 44, 47, 70, 73 and 83 of the 56(a)(1) statement should be stricken because they are not supported by either a specific citation to the affidavit of a witness competent to testify as to the facts or evidence admissible at trial; (4) Albert's denials to paragraphs 36, 49, 50 and 51 of the 56(a)(1) statement should be stricken because they are not responsive to the facts asserted by the Defendants in those paragraphs; (5) Albert's statement following his admission to paragraph 52 of the 56(a)(1) statement should be stricken because it is not supported by either a specific citation to the affidavit of a witness competent to testify as to the facts or evidence admissible at trial; (6) paragraphs 5, 18, 22, 32, 36, 41, 42, 44, 57, 58, 93, 94, 106, 115, 119, 124–29, 133, 142–45, 147 and 151 of the 56(a)(2) statement should be stricken because they are not supported by either a specific citation to the affidavit of a witness competent to testify as to the facts or evidence admissible at trial; (7) portions of paragraphs 1, 3, 11, 33, 34, 38, 40, 45, 48, 54–56 and 78 of the 56(a)(2) statement should be stricken because they are not supported by either a specific citation to the affidavit of a witness competent to testify as to the facts or evidence admissible at trial; (8) paragraphs 98, 105, 107, 108, 116, 118, 135, 138, 140–41 and 153 of the 56(a)(2) statement should be stricken because they are not consistent with the deposition testimony that they cite; (9) paragraphs 146, 148–50 and 152 of the 56(a)(2) statement should be stricken because they do not contain any evidence that is material to or probative of any issues in this case.

To the extent that these exhibits and paragraphs contain irrelevant or inadmissible material, the court has not considered the material in ruling on the motion for summary judgment. Accordingly, the motion to strike these exhibits and paragraphs that contain irrelevant or inadmissible material is **DENIED** as moot.

5. Albert was promoted along with a class of other officers. This class consisted of six white males and one black male: John Betz, a white male; Daniel Albert, a white male; Edward Moehringer, a white male; Brian Heavren, a white male; Michael Fago ("Fago"), a white male; Joseph Sikora, a white male; and Gordon Jones, a black male.

period" lasting between three and twelve months. (Dkt.# 61, Ex. 2.) If the employee does not successfully complete the probationary period, the employee is reinstated to the position that he or she occupied prior to the promotion. The probationary period is regarded as an integral part of the competitive examination process. The period is utilized by supervisors and department heads for observing the employee's work, securing the most effective adjustment of a new employee to his position, and for rejecting any employee whose performance does not meet the required work standards. (Dkt.# 61, Ex. 2.)

During the probationary period an officer is subject to probationary employee performance evaluations ("performance evaluations"). During Albert's probationary period, he received three performance evaluations that graded his work in the areas of dependability, job knowledge, skills and human relations.[6] Each evaluation was completed initially by Albert's immediate supervisor, Captain Heslin, and then forwarded up the chain of command to the Assistant Chief of Police and the Chief of Police, who then either concurred, dissented or altered Captain Heslin's assessment.

### The August 2, 2001, Performance Evaluation[7]

Albert's first performance evaluation was completed by Captain Heslin on August 2, 2001. Captain Heslin rated Albert's performance as satisfactory and As-

sistant Chief Jones and Chief Marquis concurred with the rating.[8]

### Events Contributing to the November 18, 2001, Performance Evaluation

On August 29, 2001, Albert responded to a report of a suspicious package located at the federal building in Hartford, Connecticut. The parties dispute Albert's handling of this event. According to Albert, he arrived at the scene, spoke with building a security guard, and found a vinyl suitcase behind a concrete bench outside of the building. Albert argues that the suitcase was not suspicious and that the record shows that the situation was not a bomb threat. (Dkt.# 61, Ex. 15.) Albert explained his response to Captain Heslin who then sent Assistant Chief Jones a memorandum dated October 1, 2001, which stated: "After reviewing Sgt. Morin's complaint and Lt. Albert's reply I do not believe disciplinary action is warranted against Lt. Albert. Lt. Albert arrived on scene and made an assessment of the situation. He did not believe a threat existed and so he took the steps that he did." (Dkt.# 61, Ex. 4.) Assistant Chief Jones disagreed with Captain Heslin's recommendation and, in an October 3, 2001, memorandum stated that Albert violated Order 7–1 of the HPD. Order 7–1 requires that officers who encounter suspicious packages safeguard the scene to ensure that no one touches the package.[9]

Albert contends that he did not fail to comply with Order 7–1 because the HPD had not received a bomb threat, the suit-

---

**6.** Albert disputes his supervisors' assessments of his performance and alleges that two of the evaluations were untimely.

**7.** The parties dispute the number of performance evaluations that Albert was given. After reviewing the record the court finds that there were three. For simplicity, each evaluation is referred to by the date when it was signed.

**8.** The evidence shows that the date next to Captain Heslin's signature is August 2, 2001. It further appears that August 3, 2001 is the date next to Assistant Chief Jones' signature, and that the date near Chief Marquis's signature is August 6, 2001.

**9.** It should be noted that Albert's response prompted the HPD to review Order 7–1.

case did not turn out to be a bomb, and because the only reason that Albert's response was reported to Captain Heslin was due to the fact that the reporter of the incident had a personal vendetta against Albert. Further, Albert asserts that an investigation was not initiated until the date of his demotion. On October 11, 2001, Captain Heslin completed a "Report of Disciplinary Infraction," which charged Albert with violating Section 6.08 of the HPD's Code of Conduct, "negligent failure to comply with any lawful orders, procedures, directives, or regulations, oral or written." [10] (Dkt.# 70, Ex. 1.) Albert was notified, by letter dated November 27, 2001, to attend a disciplinary hearing regarding the package incident. Although Albert does not dispute that the hearing resulted in an oral reprimand by Chief Marquis, he argues that the explanation of his actions were unjustly rejected.

On October 16, 2001, Albert responded to a report from the Connecticut Children's Medical Center that a white powder had been found. The Medical Center feared the power might have been anthrax. While at the scene, Albert concluded that white powder found in a patient's room was laundry detergent. [11] Again, the parties dispute the appropriateness of Albert's response. The Defendants claim that Captain Pawlina received a complaint from a citizen regarding Albert's actions. In his deposition, Captain Pawlina testified that he contacted the complainant over the phone and ultimately decided not to refer the incident to Internal Affairs Division. (Dkt. # 70, Ex. 15, Captain Pawlina Depo. pp. 23, 30.) Although Captain Pawlina could have initiated formal disciplinary proceedings against Albert, Captain Pawlina did not do so but, instead, counseled Albert on the incident. [12] Although Albert admits that Captain Pawlina counseled him, Albert notes that he did not receive any formal discipline regarding this incident until the day of his demotion.

On October 16, 2001, Albert responded to a second complaint fearing anthrax, at 866 Main Street, Hartford, Connecticut. The parties dispute whether a complaint was filed by Assistant Fire Chief M.A. Parker ("Assistant Chief Parker") and whether Albert received counseling from Captain Heslin regarding this incident.

On or about November 16, 2001, Captain Heslin completed Albert's first probationary employee performance evaluation. The evaluation referenced Albert's responses to the package incident and the two complaints fearing anthrax. Captain Heslin determined that Albert had a need for improvement and Assistant Chief Jones and Chief Marquis concurred with the evaluation. [13] Despite these facts, Al-

---

10. The initial penalty set forth in the HPD Code of Conduct for a violation of Section 6.08 is an oral reprimand.

11. A lab report later determined that the white powder was wall dust.

12. Captain Pawlina wrote an interdepartmental memorandum dated November 7, 2001, to Assistant Chief Jones regarding Albert's response at the Children's Hospital. Captain Pawlina wrote that he received a complaint regarding Albert's actions from a medical center administrator who accused Albert of being rude and unprofessional. The memorandum stated: "The incident ended with Lt.

Albert concluding that the white powder found in a patient's room was laundry detergent. However, hospital staff members found out later that the hospital laundry uses only liquid detergent, and not powder, adding to their dissatisfaction with LT Albert's response." (Dkt.# 61, Ex. 9.) The complainant, however, did not want to make a formal complaint against Albert. Albert notes that Captain Pawlina never observed Albert to be rude. (Dkt. # 70, Ex. 15, Captain Pawlina Depo p. 52).

13. It should be noted that Chief Heslin sent Albert to attend a week-long middle manage-

bert continues to contest that he handled the package incident and the complaints fearing anthrax, properly.

### Events Contributing to the April 1, 2002, Performance Evaluation

On March 6, 2002, HPD's Internal Affairs Division commenced an investigation into allegations that Albert regularly removed newspapers from a D.B. Mart, read the papers and returned them without paying. The investigation was conducted by Sergeant Richard Calderone ("Sergeant Calderone"), whom Albert believed to be fair and impartial. Sergeant Calderone completed a "Report of Disciplinary Infraction," on March 20, 2002, which sustained a violation of Section 1.00 of the HPD's Code of Conduct, "Conduct Unbecoming an Employee."

Albert notes that the Internal Affairs investigation did not sustain a criminal violation against him or find that he stole any newspapers from the D.B. Mart. Further, Albert argues that he "removed newspapers from the D.B. Mart with the owner's permission and returned them later in the day." (Dkt. # 70, Ex. 15, Albert Aff. ¶ 7). Albert concedes, however, that there may have been a failure to communicate or that the proprietor might have felt intimidated.

The allegations surrounding Albert's actions at the D.B. Mart surfaced in a series of media reports in *The Hartford Courant.* Albert argues that these newspaper reports were false. Specifically, Albert argues that Manager Ilg requested *The Courant* to focus its reporting on Albert's mistakes rather than the plight of the D.B. Mart proprietor. This request, Albert claims, made Chief Marquis more likely to demote Albert. As evidence of the malintent Albert cites to Manager Ilg's testimony: "As chief executive, I wanted to set a

standard and that standard was that if someone had done something wrong whether it was a police officer or not, that no one else was to interfere with the investigation by the police." (Dkt.# 70, Ex. 15, pp. 37–38.) As a result of this media pressure, Albert argues, Chief Marquis felt compelled to demote Albert.

On March 6, 2002, Captain Heslin completed Albert's performance evaluation, providing a rating of "satisfactory." Upon submitting the evaluation, Captain Heslin did not possess knowledge of the Internal Affair's investigation of the newspaper incident. The evaluation form was forwarded to Assistant Chief Jones, who was aware of the investigation. Assistant Chief Jones disagreed with Captain Heslin's assessment and determined that Albert's work had a need for improvement and was not satisfactory. Chief Marquis also disagreed with Captain Heslin's assessment of Albert and submitted a memorandum entitled "Interim Probationary Evaluation," that stated:

> The conduct that came to light during a recent internal investigation shows that during the period of this evaluation you have exhibited a serious lack of judgment in areas critical to proper supervision. Your immediate supervisor apparently had no knowledge of the specifics of the investigation prior to his review of the evaluation. The information compiled in this investigation has shown that you performed unsatisfactorily during this evaluation period. (Dkt.# 70, Ex. 9.)

### Albert's Demotion

On April 2, 2002, Chief Marquis submitted a memorandum to Patricia C. Washington ("Washington"), the Director of Personnel, recommending that Albert be

ment training course at the Connecticut Police Academy.

demoted. Pursuant to the Personnel Rules, Chief Marquis had the authority to recommend that Albert be demoted and Washington had the authority to approve such a recommendation. Chief Marquis' memorandum stated, in pertinent part:

"The position of Police Lieutenant requires considerable knowledge of the methods, principles, practices and techniques of police and detective work. It also requires considerable knowledge of the principles and practices of police administration and of controlling laws and ordinances. Critical to the performance of this position is the ability to observe situations analytically and objectively [and to] act accordingly.... Upon arrival [on August 29, 2001], Lieutenant Albert retrieved the suspicious package and deemed it safe. He failed to follow Order 7–1 procedures and regulations relating to bomb, bomb threats, etc.... Lieutenant Albert is currently being investigated regarding an incident with the public that came to light on March 6, 2002. Based on preliminary reports, it is my opinion that Lieutenant Albert's judgment is, again, in question.... Despite being trained, counseled and disciplined, Lieutenant Albert has continued to fail in properly executing the responsibility with which he is charged. He has repeatedly failed to exercise the considerable judgment that must be exercised independently in interpreting orders, rules, and regulations as a commanding officer.... Lieutenant Albert has repeatedly exhibited very significant inappropriate conduct and failed to live up to the expectations of a supervisor. His own failure in judgment has deeply affected those he commands by bringing the question of integrity of his leadership, compromised potentially dangerous situations and has irreparably harmed the image of the Hartford Police Department." [14] (Dkt.# 70, Ex. 14.)

Washington approved the recommendation and authorized Albert to return to the rank of sergeant. Albert received notice of his demotion on April 3, 2002. A few months later, on June 8, 2002, Albert was transferred to the detention division. As far as the court can determine, Albert remains in this position despite at least one request for transfer to patrol. (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. p. 129.)

### The August 5, 2003, Disciplinary Hearing

On August 5, 2003, Assistant Chief Reilly held a disciplinary hearing to determine whether to sustain three Code of Conduct violations that had been assessed against Albert in the years since his demotion. The first violation was of Section 1.00, "conduct unbecoming to an employee." This violation stemmed from an incident that took place on July 16, 2002. On that day, Albert allegedly approached a witness who, when subsequently interviewed by investigators, was reluctant to speak ("the witness incident"). Chief Marquis ordered an Internal Affairs investigation regarding Albert's conduct with this witness. The investigation was conducted by Sergeant Neville A. Brooks ("Sergeant Brooks"), who was under the direct supervision of Lieutenant Neil Dryfe ("Lieutenant Dryfe"), Commander of Internal Affairs Division. The investigation,[15] which concluded that Albert exercised very poor judgment

---

**14.** Among other things, the memorandum also references that subsequent to the federal building incident and complaints fearing anthrax, Albert received counseling and was sent to two training programs.

**15.** The investigation began on August 26, 2002, and ended November 5, 2002.

in his dealings with the witness, yielded an atmosphere of fear and discouraged the cooperation of a witness. (Dkt.# 61, Ex. 17.)

The second charge addressed at the hearing was for the violation of Section 6.09, "intentional and willful failure to comply with any lawful orders, procedures, directives or regulations, oral or written." This violation stems from a report that on May 26, 2003, Albert spent an hour reading a book while on duty and in full uniform at a West Hartford diner ("the lunch break incident"). (Dkt.# 70, Ex. 1.) Albert's conduct at the diner was reported to Assistant Chief Jones by Captain Perez. As a result of Captain Perez's report Albert's supervisor, Lieutenant Kenary, completed a Report of Disciplinary Infraction dated June 10, 2003. This report was affirmed and signed by Assistant Chief Kevin Jones. The basis of the violation was that Albert took an elongated lunch break that was outside of the jurisdiction and without the permission of his supervisor.

The final charge addressed at the hearing was for the violation of Section 8.04, "failure to be on time when reporting for duty, including roll calls, court appearances, and other duty assignments." This violation was the result of Albert arriving late to work on May 30, 2003 ("the late incident"). (Dkt.# 70, Ex. 1.) In fact, Albert arrived at 7:30 a.m., which was the normal time for his scheduled shift. Unbeknownst to Albert, his shift time had changed and he was now supposed to arrive at 7:00 a.m. Lieutenant Mark Rudewicz ("Lieutenant Rudewicz"), Commander of the HPD Detention Division, submitted

a "Report of Disciplinary Infraction" charging that Albert was assigned to work in detention for squad A from 7:00 a.m. until 3:00 p.m., but that Albert arrived at 7:30 a.m. On June 15, 2003, Captain Pawlina signed the form notwithstanding the knowledge that Albert was not given notice of the shift change. Captain Pawlina wrote that Albert should be disciplined even though "[i]t does appear that Sgt. Albert was *not* notified of assignment change." (Dkt.# 70, Ex. 1.) Assistant Chief Jones signed his name below Captain Pawlina's note, affirming it's contents.

At the disciplinary hearing, Albert was forced to defend against each of the three violations. In a letter dated September 16, 2003, Assistant Chief Reilly sent Chief Marquis a memorandum of the findings from the disciplinary hearing. (Dkt.# 70, Ex. 3.) The Section 1.00 violation was sustained. Albert maintains, however, that he did not use poor judgment with the witness and that the incident was brought up as a means of retaliating against him for the filing of the present lawsuit. The Section 6.09 violation was also sustained. The Section 8.04 violation, however, was not sustained due to the fact that Albert had no knowledge of the shift change. (Dkt.# 70, Ex. 3.) In a letter dated September 23, 2003, Chief Marquis suspended Albert for fifteen (15) days. Albert filed a grievance for this suspension pursuant to the CBA of the HPD.[16]

Additional facts, undisputed or construed in a light most favorable to Albert, will be discussed as to individual claims.

## II. DISCUSSION

Albert brings this action against the Defendants alleging the violation his Four-

---

16. All police officers employed by HPD are subject to the collective bargaining agreement ("CBA"). The CBA is a multi-step grievance procedure, culminating in arbitration for resolving disputes that arise under the agree-
ment. (Dkt. # 70, Pl.'s Fed.R.Civ.P. 56(a)(2) Statement, p. 21, ¶ 59.) Here, the grievance was processed and was pending arbitration by the Connecticut State Board of Mediation and Arbitration on October 25, 2004.

teenth Amendment Right to Equal Protection, the violation of his Fourteenth Amendment Right to Procedural and Substantive Due Process, and the intentional infliction of emotional distress under Connecticut law. Albert's action also seeks to recover against the City Defendant pursuant to a violation of 42 U.S.C. § 1983, and against the Individual Defendants for violating his First Amendment Right against retaliation. The motion for summary judgment is made with respect to each count of the Amended Complaint and raises qualified immunity as a defense. Each claim is discussed in turn herein.

### A. Summary Judgment Standard

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if, after discovery, the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (internal quotation marks omitted) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)). A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. "Persons" Under 42 U.S.C. § 1983

Prior to addressing each count, the court must consider the Defendants claim that summary judgment should be granted on Counts One, Two and Five because under § 1983 the Defendants are not "persons," and therefore can not be sued in their official capacities. In support of their argument the Defendants rely on the Supreme Court decision of *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The issue is whether local government entities are "persons" acting under color of state law such that they may be sued under 42 U.S.C. § 1983.

The Defendants reliance on *Will* is erroneous. To state a claim under § 1983, a plaintiff must allege a constitutional deprivation by "persons" acting under color of state law. 42 U.S.C. § 1983. Under *Will*, "neither a *State nor its officials* acting in their official capacities are 'persons' under § 1983." *Id.* at 71, 109 S.Ct. 2304 (emphasis added). Here, however, the entity in concern is not the state and its officials but rather the local government and its officials. The issue of whether local government bodies could be sued under § 1983 was addressed in the case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Monell court held that "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690, 98 S.Ct. 2018. The Court further explained that bodies of lo-

cal governments may be sued under § 1983 for monetary, declaratory, or injunctive relief where the allegedly unconstitutional action was the result of a policy or custom. *Id.* at 690–91, 98 S.Ct. 2018. Accordingly, this argument of the Defendants will not be considered in the following decision.

### C. The Fourteenth Amendment Right to Equal Protection

In the First Count of his Amended Complaint, Albert alleges that "[t]he acts of the [I]ndividual [D]efendants, under color of law, by virtue of their authority as police supervisors and state officials of the City of Hartford, herein alleged constitute a denial to [Albert] of the equal protection of the laws guaranteed to him by the Fourteenth Amendment to the United States Constitution." (Dkt.# 47, Am.Compl.¶ 24.)

The Fourteenth Amendment to the United States Constitution provides, "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A plaintiff claiming a violation of his equal protection rights can proceed according to several theories:

> A plaintiff could point to a law or policy that expressly classifies persons on the basis of race.... Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner.... A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

*Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir.2000) (citations omitted; internal quotation marks omitted). Further, the United States Supreme court has held that a plaintiff need not be a member of a traditionally "protected class" in order to allege an equal protection violation. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Instead, a plaintiff may bring claims as "a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073 (internal quotation marks omitted). Courts afford a plaintiff the opportunity to bring "class of one" actions because "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* (internal quotation marks omitted).

The court finds it difficult to determine exactly which equal protection violation Albert is proceeding under. Albert contends that "[he] was not treated the same as similarly situated officers" and that "[he] was falsely disciplined and demoted because of his race." (Dkt.# 47, Am. Compl.Cnt.¶¶ 22.) Albert alleges that "[a]fter false reports and publicity, the defendants began a campaign to undermine the plaintiff and destroy his position within the department," and "[t]he defendants misconstrued facts, altered documents and covered up departmental violations by other officers in order to demote and discipline Albert." (Dkt.# 47, Am. Compl.Cnt.¶ 14–15). Given these actions, Albert claims that the Defendants violated his constitutional rights and "have not expressed any legitimate reason for singling him out and discriminating against him."

(Dkt.# 47, Am.Compl.Cnt.¶ 31). Accordingly, the court understands Albert's allegations to be comprised of a class of one equal protection claim as well as a hostile work environment equal protection claim.

### 1. Equal Protection "Class of One"

■ "In order to succeed on a class of one claim, the level of similarity between [the] plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotation marks omitted). Moreover, the plaintiff must "alleg[e] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Inturri v. City of Hartford,* 365 F.Supp.2d 240, 251 (D.Conn.2005) (internal quotation marks omitted). "[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are *prima facie* identical." *Neilson,* 409 F.3d at 105 (emphasis in original; internal quotation marks omitted); *see Inturri,* 365 F.Supp.2d at 251 (holding that, to be considered similarly situated, "employees must be similarly situated in all material respects") (internal quotation marks omitted). Indeed, the level of similarity must be so great that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson,* 409 F.3d at 105. Thus, in class of one cases, "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain." *Neilson,* 409 F.3d at 105 (citing *Olech,* 528 U.S. at 565, 120 S.Ct. 1073.).

■ To prevail on his class of one claim, Albert must set forth evidence that would permit a reasonable jury to find that his position in the police force was prima facie identical, in all material aspects, to the comparators who were retained or promoted.[17] In Albert's memorandum in opposition to the motion for summary judgment he contends that he is similarly situated to Lieutenant Malik Merritt, Lieutenant Henry Martin, Lieutenant Giselle Gamble, Lieutenant Jones, Lieutenant Ron Bair, and Lieutenant Daryl Roberts. The court, in reviewing Albert's materials, concludes that he cannot prove that he is similarly situated because these officers incurred less numerous and less significant behavioral complaints and they worked under different probationary conditions than Albert.

Albert's class of one action must fail because he cannot show that the other officer's incurred similar behavioral complaints and code violations. Albert has neither argued nor set forth any evidence to show that either Lieutenants Jones, Merritt, or Bair incurred any complaints or code violations. Thus, Albert cannot prove that he is similarly situated with these officers. Albert does set forth evidence, however, that Lieutenants Roberts,

---

17. Albert's equal protection claim is premised upon disparate treatment he allegedly endured while he served as a probationary lieutenant. He does not assert an equal protection claim for any disparate treatment he may of endured as a police sergeant.

Gamble and Martin were assessed behavioral complaints. Specifically, in his deposition, Albert claims that Lieutenant Roberts received a violation in the spring of 2002 for mismanaging a subordinate, but that Chief Marquis covered up this incident.[18] (Dkt. # 70, Ex. 15, Albert Depo. pp. 51–53) Albert also argues that Lieutenant Gamble received a one day suspension for being absent without permission. (Dkt. # 70, Defs.' Stat. ¶ 80). Finally, Albert contends that on October 12, 2003, Lieutenant Martin received an unsatisfactory evaluation for excessive use of sick days. (Dkt. # 70, Defs.' Stat. ¶ 81).

None of these incidents place the officers in a similar light to Albert[19] because he incurred a greater number of complaints than the other officers. Whereas Albert incurred three unsatisfactory probationary reports, four code violations,[20] and various other complaints,[21] the evidence shows only one incident that reflected poorly on Lieutenants Roberts, Gamble and Martin. Second, Albert is not similar to the other officers because the complaints that he received related to his on-duty practice and procedure.[22] Conversely, when Lieutenants Gamble and Martin were disciplined it was not for their on-duty practice and procedure, but rather their off-duty use of absences and sick time. The court also notes that while Lieutenant Roberts allegedly was disciplined for his on-duty practice and procedure, this can not be considered by the court because Albert has failed to corroborate this assertion with the proper evidence. Therefore, none of the incidents argued by Albert prove that he is similarly situated to the other officers.

The officers also are not similar to Albert because different conditions and circumstances existed for each officer during his probationary period as lieutenant. For example, each of the six officers named by Albert, with the exception of Lieutenant Jones, were promoted to lieutenant at different times than Albert. Albert was appointed to lieutenant on May 27, 2001,[23] Lieutenants Roberts and Merritt were promoted on July 28, 2002, Lieutenant Martin was promoted on December 12, 2002, and Lieutenants Gamble and Bair were promoted on January 14, 2004. Logically, officers who work under different time periods are subject to different situations and circumstances within the department.

Another difference between Albert and the other officers is the class size in which

18. Albert did not support this assertion with any corroborative evidence.

19. This finding includes the assumption that Albert submitted the proper evidence to prove that Lieutenant Roberts received a code violation.

20. The code violations sustained against Albert were, (1) Section 6.08 on August 29, 2001, (2) Section 1.00 on March 25, 2002. and (3 and 4) Sections 1.00 and 6.09 on August 5, 2003.

21. The parties dispute various incidents of complaints against Albert. The parties agree, however, that on October 16, 2001, the Connecticut Children's Medical Center filed a report against Albert for his response to an incident where anthrax was thought to be involved. Albert received counseling from Captain Heslin for this incident.

22. The code violations sustained against Albert were for, (1) negligent failure to comply with any lawful orders, procedures, directives or regulations; (2 and 3) conduct unbecoming to an employee (4) intentional and willful failure to comply with any lawful orders, procedures, directives or regulations, oral or written.

23. Other officers promoted on this day include: John Betz, Daniel Albert, Edward Moehringer, Brian Heavren, Michael Fago, Joseph Sikora, and Gordon Jones. (Dkt. # 70, Pl's Stat. at ¶ 70).

the officers were promoted. While Albert and Lieutenant Jones were promoted with six other officers, Lieutenants Roberts and Merritt were promoted with three, Lieutenant Martin was promoted with no one else, and Lieutenants Gamble and Bair were promoted with nine other officers. The varying class size, not to mention the amount of permanent lieutenant positions available for any given class, no doubt effects the situation of each individual officer.

Another circumstance that varied for some of the six officers is that some were promoted by Chief Marquis while others were promoted by Chief Pawlina. Where as Albert, Jones, Roberts, Merritt, and Martin were promoted by Chief Marquis, Lieutenants Gamble and Bair were promoted by Chief Pawlina. Thus, with the exception of Lieutenant Jones, the conditions and circumstances that the other officers faced were substantially different from those that Albert faced.

Accordingly, given the difference in the complaints and the conditions of the probationary period, Albert cannot show that he is prima facie identical in all material aspects to any of the other six officers.[24] Therefore, the Defendants' motion for summary judgment as to the class of one claim in **GRANTED**.

### 2. Equal Protection Hostile Work Environment

Section 1983 provides a cause of action for race-based employment discrimination based on a hostile work environment. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143–44 (2nd Cir.1993). Courts considering § 1983 Equal Protection claims utilize Title VII law in deciding whether a plaintiff has established a hostile work environment claim. *See Jem-*

*mott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996). In such a case, a plaintiff facing a motion for summary judgment must first set forth evidence from which a reasonable trier of fact could conclude that the workplace "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment. . . ." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003) (quoting *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999)). The abusive conduct must have occurred because of the plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999). This must be shown because the purpose of § 1983 is to prohibit discrimination against certain protected classes, and not to provide a general code of civility. *See Lewis v. North General Hosp.*, 502 F.Supp.2d 390, 402 (S.D.N.Y. 2007) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Finally, a plaintiff must demonstrate "that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Mack*, 326 F.3d at 122 (internal quotation marks omitted) (citing *Richardson*, 180 F.3d at 436).

Proving that an environment is permeated with discriminatory intimidation requires both "objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). While "no single fac-

---

**24.** The court also notes that Albert failed to make any argument proving that he was in-

tentionally treated differently from the other six officers.

tor is required," *see Harris* 510 U.S. at 23, 114 S.Ct. 367, the incidents must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks omitted). Incidents that occur infrequently and over a short period of time may not suffice in proving a hostile work environment. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987); *see also Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" (internal quotation marks omitted)). This court is mindful, however, that even though prior hostile work environment cases have exposed instances of appalling conduct, there is no set standard that a plaintiff must meet for a claim to be actionable. *See Richardson,*

180 F.3d at 439. "In the end, determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks omitted).

In the present case, Albert argues that "[e]vidence exists to indicate that [the][D]efendants created a racially hostile environment ..." (Dkt. 69, Pl.'s Memo p. 24). In an attempt to prove this argument, Albert has set forth a complicated pattern of evidence that purports to explain the racial backgrounds of the officers and the promotion and demotion decisions of the Defendants.[25]

The Defendants disagree with Albert, arguing that his evidence does not show a racially hostile environment and further, that his claim can not survive because his argument is based solely on demotion. Specifically, "[h]e alleges nothing more

---

25. The evidence set forth to show this environment is as follows: Albert, along with six other officers, was promoted to Lieutenant on May 27, 2001. In August of 2001, Chief Marquis intended to promote four lieutenants to fill the spots vacated by four officers who were being promoted to Captain: Perez, a hispanic female, Robert Carlson, a white male, Pawlina, a white male; and Heslin, a white male. On July 28, 2002, Chief Marquis promoted the following individuals to lieutenant: Daniel Depinto, a white male, filling the position created by Heslin; Daryl Roberts, a black male, filling the vacancy created by Pawlina; Mark Rudewicz ("Rudewicz"), a white male, filling the vacancy created by Robert Carlson; and Merritt, a black male, filling the vacancy created by Perez.

On November 26, 2002, Chief Marquis notified City Manager Lee Erdmann ("Erdmann") that, as a result of two lieutenants retiring and two others being demoted, four positions would soon be vacant. The lieutenants retiring were James Blanchette, a white male, and Dennis Dowd, a white male. The lieutenants being demoted were Albert and Fago, a white male. The parties dispute what happened

next. The Defendants assert that on December 12, 2002, Chief Marquis promoted Henry Martin ("Miller"), a black male, to lieutenant, filling the vacancy created by Fago. Albert contends that Martin filled the position that was left open after Albert was demoted. Chief Marquis resigned from the HPD on December 30, 2003, and was replaced by Chief Pawlina. On January 14, 2004, Chief Pawlina selected all ten eligibles on the lieutenant list to be promoted. The following individuals were promoted: Patrick Jobes, a white male, filling the vacancy created by the retirement of Gordon Jones, a black male; Donald Chafin, a black male, filling the vacancy created by the retirement of Michael Manzi, a white male; John Schmaltz, a white male, filling the vacancy created by the retirement of Martin, a black male; Stephen Miele, white male, filling the vacancy created by the retirement of Rudewicz; Clifford Smith, a white male, filling the vacancy created by the retirement of Joseph Sikora, a white male. The following personnel forms do not reflect which vacancies they filled: William Schwarz, a white male; Ronald Bair, a black male; Giselle Gamble, a black female; Andrew Nelson, a black male.

than that he was demoted and replaced by a black male" and further, "[e]ven if there were evidence for this claim ... viewed objectively, demotion alone cannot create a hostile work environment." (Dkt. # 59, Defs.' Memo. p. 8.)

■ Here, the court finds that no reasonable jury could conclude that Albert experienced severe or pervasive discrimination because he was white. Albert has not offered sufficient proof to show that the Defendants created a racially hostile environment against white people. In paragraphs seventeen and eighteen of the Amended Complaint Albert alleges that he and another white man were demoted and replaced by two black males. This allegation, however, cannot be considered an incident that is a basis for a race discrimination claim because, without supporting evidence, it requires a fact-finder to make a fantastic assumption. Merely because two whites are demoted and replaced by two blacks does not mean that the Defendants engage in a policy that favors one race over another. Without supporting evidence that shows that the Defendants used racial slurs or comments when promoting and demoting the lieutenants, this incident is not sufficient proof of discrimination.

Even assuming that a reasonable jury could find that the evidence satisfies a claim of race discrimination, Albert has not satisfied the pervasiveness requirement to survive summary judgment. Pervasiveness requires that Albert demonstrate that either a single incident was extraordinarily severe, or that a series of incidents were so continuous that they altered his work conditions. *See Whidbee,* 223 F.3d at 69. In his memorandum in opposition to the motion for summary judgment (Dkt. # 69 Pl.'s Memo. p. 27), Albert asserts the following: "[He] has been subject to ongoing harassment by his supervisors in the form

of trumped up discipline, unequal discipline, undeserved demotion and transfer. The defendants went beyond the normal process in providing [he] with evaluations and in determining his demotion.... [He] was given evaluations during his probationary period that were untimely, were purposefully delayed and where the direct supervisor's recommendations were ignored.... [He] has been forced to work in the [d]etention [d]ivision which is the least preferred [d]ivision and [he] is forced to work [t]hird [s]hift, which is the least preferred shift. For four years [he] has been subject to an ongoing pattern of harassment...." These incidents are insufficient to support Albert's claim here because while a fact-finder may find that they indicate abusive conduct, they do not indicate racially abusive conduct. In this case, the law is clear, if not based on a plaintiff's membership in a protected class under Title VII, abusive conduct in the workplace is not actionable under § 1983. *Lewis,* 502 F.Supp.2d at 402. Accordingly, the Defendants motion for summary judgment as to the claim of a hostile work environment is **GRANTED.**

### 3. Other Equal Protection Claims

Albert, in his complaint and in his opposition papers, seems to rely on other equal protection violations. Specifically, Albert alleges in his First Count that "[he] was falsely disciplined and demoted because of his race" (Dkt. # 47, Am. Compl. Cnt. 1 ¶¶ 23) and that the lieutenant vacancies created after he and another white probationary lieutenant were demoted were filled by black officers. (Dkt. # 47, Am. Compl. Cnt. 1 ¶¶ 17–18). The court interprets these allegations as an equal protection claim that is based upon a selective prosecution theory. This claim, however, fails for the same reason as the class of one claim. The Second Circuit has held,

"To succeed in an action alleging selective prosecution, plaintiffs in this Circuit have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). As Albert cannot satisfy the similarly situated prong, he therefore cannot establish an equal protection claim premised upon a selective prosecution theory.

Albert also seems to argue that he has suffered an equal protection violation based on violations of age and gender discrimination. In Albert's memorandum in opposition he claims that the action arises "under Title 42 U.S.C. § 1983; violations of the First and Fourteenth Amendments to the United States Constitution; and violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., ('ADEA')." Similarly, in section C of the memorandum in opposition to the motion for summary judgment, Albert argues that "[Albert] has established claims of discrimination pursuant to the ADEA and gender discrimination in violation of the equal protection clause." These assertions were not alleged in the complaint and therefore are not properly before the court. Even if they were alleged in the complaint, Albert offers no evidence to support these claims. He does not set forth his age or allege how he was treated differently from older or younger officers. In addition, Albert does not establish how he was treated differently from similarly situated female officers. Unsupported allegations are not sufficient to withstand a motion for summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). Accordingly, to the extent that Albert pursues an equal protection theory on age or gender discrimination, those claims fail. Thus, the Defendants motion for summary judgment as to the claims of selective prosecution, age discrimination and age discrimination is **GRANTED.**

D. The Fourteenth Amendment Right to Procedural and Substantive Due Process; Intentional Infliction of Emotional Distress

In Count Two of the Amended Complaint Albert alleges that the Defendants violated his rights to procedural and substantive due process under the Fourteenth Amendment. In Count Four of the Amended Complaint Albert alleges that the Defendants intentionally caused him to suffer emotional distress. The Defendants seek summary judgment on the grounds that there are no material facts in dispute and they are entitled to judgment as a matter of law. In his opposition to summary judgment, Albert fails to address either of these claims. In the Defendants' reply to the memorandum in support of the motion for summary judgment, they argue that these counts should be abandoned because Albert has not opposed them in his opposition papers. The court agrees.

Since Albert has failed to address these claims in his opposition to summary judgment, they are deemed abandoned. *See Santiago v. Newburgh Enlarged City School Dist.*, 485 F.Supp.2d 327, 338 (S.D.N.Y.2007) (dismissing the plaintiff's claim that she was fired in retaliation for complaining about discrimination because she failed to respond to the defendant's summary judgment argument); *Coger v. Connecticut*, 309 F.Supp.2d 274, 280 (D.Conn.2004) (noting that the court can

consider a[§ ] 1981 claim abandoned merely because the plaintiff failed to respond to the defendant's argument that summary should be granted in his favor); *Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal Courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way"); *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (holding where the defendant's summary judgment motion addresses specific employment discrimination claims, and the plaintiff's opposition papers do not oppose such arguments, court may deem the claims abandoned and grant summary judgment).

Therefore, the Count Two claims, for violations of procedural and substantive due process and the claim in Count Four, for intentional infliction of emotional distress, are deemed abandoned and summary judgment is **GRANTED** in favor of the Defendants.

### E. Violation of 42 U.S.C. § 1983

In Count Three of the Amended Complaint Albert alleges that the City Defendant unlawfully deprived his rights in one or more of the following ways: "B. Failure or refusal to take appropriate investigatory, supervisory and, or, disciplinary action against the City of Hartford supervisors with regard to the negligent, reckless, malicious, deliberate, indifferent, willful, intentional and unlawful conduct complained of. . . ." (Dkt. # 47. Am. Compl. Cnt. 3 ¶ 5). For a municipal entity to be held liable under § 1983 for the unconstitutional acts of its employees, a plaintiff must allege and prove that his constitutional rights were violated, that the alleged actions by the employees were the result of an official policy, custom, or practice of the municipal defendant, and that the policy, custom, or practice caused the alleged injuries. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell,* 436 U.S. at 690–95, 98 S.Ct. 2018; *McDonald v. Bd. of Educ.,* No. 01 Civ.1991(NRB), 2003 WL 21782685, *2, 2003 U.S. Dist. LEXIS 13338, *8 (S.D.N.Y. July 31, 2003).

A plaintiff may satisfy the "policy, custom or practice" requirement by demonstrating in one of four ways: (1) a formal policy which is officially endorsed by the municipality, *see Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the [plaintiff's] civil rights, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive notice knowledge of policy-making officials, *see Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; or (4) a failure by official policy makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact, *see Harris,* 489 U.S. at 388, 109 S.Ct. 1197. *See Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996). The Second Circuit has made clear that "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000). The issue before the court, therefore, is whether Chief Marquis is a policymaker such that liability must be imposed on the city under § 1983.

■ In the instant case, the City Defendant argues that merely because Chief Marquis had discretionary authority to administer personnel policy does not render him a final policymaker. Chief Marquis had the discretionary authority to recommend decisions regarding the hiring and firing of employees, but was constrained by policies set forth in the Personnel Rules, the Court of Common Council and the City Manager. (Dkt. 60, Pl.'s Stat. ¶¶ 1–8.) Expressly, it is the Charter of the City of Hartford that limits Chief Marquis' powers by vesting final policy making authority with the Council. (*Id.* at ¶ 1, 2.) The Chapter provides that "no person in the classified service of the city or seeking admission thereto shall be appointed, promoted, reduced, removed or in any way favored or discriminated against because of his race, national origin or his political or religious opinions or affiliations." (*Id.* ¶ 3.)

The City Defendant equates its situation to that of the defendants in *Looby v. City of Hartford,* 152 F.Supp.2d 181 (D.Conn. 2001). In *Looby,* the plaintiff fireman sought to impose liability on the city of Hartford for the alleged unconstitutional actions of the fire chief in refusing to promote the plaintiff from lieutenant to captain. The *Looby* court concluded that even though the fire chief had the authority, through the City Charter, to appoint and remove employees and to institute rules and regulations concerning employee conduct and department operations, he was not a final decision maker. *Id.* at 188–89; *see also Gordon v. Marquis,* No. 3:03–cv–01244 (AWT), 2007 WL 987553, *15, 2007 U.S. Dist. LEXIS 27811, at *52 (D.Conn. Mar. 31, 2007) ("Marquis possessed the ultimate authority to make transfer decisions in addition to employment decisions … [but] he did not have policymaking authority."); *Knight v. Hartford Police Dept.,* No. 3:04CV969 (PCD),

2006 WL 1438649, **20–21, 2006 U.S. Dist. LEXIS 36331, at *72 (D.Conn. May 22, 2006) ("it is evident that the individual defendants [including Chief Marquis] did not have policymaking authority with respect to promotions nor with respect to extending promotional eligibility lists").

Albert disagrees with the City Defendant's assertion that Chief Marquis is not a policymaker. In support of this argument, Albert cites to the case of *O'Connor v. Barnes,* No. 97–CV–1489 (LEK/DNH), 1998 WL 1763959, **3–6, 1998 U.S. Dist. LEXIS 3386, at *11–17 (N.D.N.Y. March 18, 1998). In *O'Connor,* the plaintiffs, county jail employees, brought an action under § 1983 and 42 U.S.C. § 1985(3) seeking to impose liability on the sheriff, other officers, and the County of Schenectady, for violating the plaintiffs' First Amendment rights by retaliating against them for having reported the misconduct of co-workers. *Id.,* 1998 WL 1763959, *1, 1998 U.S. Dist. LEXIS 3386 at * 1. Albert argues that because the *O'Connor* court found that the sheriff was a policymaker, this court should similarly find that Chief Marquis is a policymaker. The facts in *O'Connor,* however, are distinguishable from the facts in the instant case.

The *O'Connor* court found that the sheriff of Schenectady was a policymaker because his decisions were unconstrained and because the Second Circuit already had held that the position of sheriff is "the highest ranking law enforcement official in the County." *Id.,* 1998 WL 1763959, **4–5, 1998 U.S. Dist. LEXIS 3386, at * 14 (internal quotation marks omitted). Here, the decisions of Chief Marquis are constrained, so by definition, he can not be considered the highest ranking official in the city of Hartford. The Charter and other ordinances of Hartford reflect this fact. Specifically, the Director of Personnel has the authority to make rules, the

Personnel Board can adopt or amend these rules, and the Court of Common Council either approves or disapproves these rules. It is this presence of review mechanisms that prevents Chief Marquis from being a final decision maker. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *see also O'Connor*, 1998 WL 1763959, **4–5, 1998 U.S. Dist. LEXIS 3386 at *12–13 ("an official with authority to make decisions in a particular area can be considered a policymaker where there is an absence of either substantive constraints on or meaningful review of the official's choice") (citing *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir.1988), *cert. denied, City of Little Rock v. Williams*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989)). The fact that Albert has not demonstrated that Chief Marquis possessed something more than discretion in examining certain functions prevents him from recovering from the City Defendant for a violation of § 1983.

Moreover, *O'Connor* does not determine the outcome of this case because the court was constrained in the evidence that they could consider. The defendant's motion in *O'Connor* was a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Under a motion to dismiss the court must base its decision on whether "it [was] clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In the present case, however, the City Defendant's motion is for summary judgment. Therefore, the court enjoys the benefit of considering additional affidavits and depositions that could not be considered in *O'Connor*.

Albert also alleges, in Count Three of the Amended Complaint, two other claims that are without merit. First, Albert alleges that the City Defendant deprived his rights by failing to supervise its employees. (Dkt. # 47. Am. Compl. Cnt. 3 ¶ 5.) Second, Albert claims that the City Defendant has a history of permitting retaliation against individuals seeking redress from the government. (*Id.*) Albert has not produced evidence that supports any assertion regarding a failure to supervise any of the officers involved in the promotion, demotion, or suspension decisions. To satisfy a claim of inadequate training or supervision, the theory must "be based on more than the mere fact that the misconduct occurred in the first place." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 130 (2d Cir.2004). Similarly, to survive summary judgment under a theory of historical retaliation, the court requires evidentiary support of past individuals who, upon seeking redress from the government, were wronged by a city's retaliatory behavior. Due to the lack of supporting evidence for Albert's allegations, the court refuses to permit a jury to hear such claims.

Accordingly, the City Defendant's motion for summary judgment as to Count Three of the Amended Complaint is **GRANTED.**

### F. The First Amendment Right Against Retaliation

 In Count Five of the Amended Complaint, Albert alleges that, as a result of his initiating this action, the Individual Defendants retaliated against him in violation of § 1983 and the First Amendment. For a public employee to succeed on a First Amendment retaliation claim under § 1983 he must show, by a preponderance of the evidence, that "(1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected expression, and (3) a causal relationship existed

between the constitutionally protected expression and the retaliatory action." *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir.2003). Even assuming a plaintiff can establish these factors, the defendant can still succeed on a motion for summary judgment if it can demonstrate "that it would have taken the same adverse employment action even in the absence of the protected conduct." *Cotarelo v. Village of Sleepy Hollow Police Dept.*, 460 F.3d 247, 252 (2d Cir.2006) (internal quotation marks omitted); *see Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir.2003) ("Regardless of the presence of retaliatory motive ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.").

The Individual Defendants, in their memorandum in support of the motion for summary judgment, argue that Albert's retaliation claim must fail because it does not involve a matter of public concern and he is unable to show that the Individual Defendants' actions were a result of the filing of this lawsuit. Further, the Individual Defendants argue that the court has no jurisdiction to hear this claim because Albert has failed to exhaust his grievance and arbitration procedure. In opposition, Albert maintains that the matter was public and that he was retaliated against after filing the instant lawsuit.

### 1. Protected Speech

For Albert's speech to be protected under the First Amendment it must be shown that the speech concerned a matter of public concern. *See Cotarelo*, 460 F.3d at 252. Whether an employees speech is related to a matter of public concern is a question of law that must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir.1991) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The employee must speak "as a citizen upon matters of public concern," rather than "an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684; *see also Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999) (when determining whether speech is of public concern, the court should focus on the speaker's motives and determine if the speech was calculated to redress personal grievances or whether it had a broader public purpose). At the same time, this court is aware that while certain issues may touch upon matters of public concern, the issue is whether the speech may be "fairly considered" as relating to such issues. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684.

A court deciding whether a plaintiff's speech concerns a public matter must consider the recent restrictions the Supreme Court placed on an employee who make statements pursuant to his official duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). In *Garcetti*, the Supreme Court considered whether a plaintiff deputy district attorney, who was disciplined for writing a memorandum to his supervisor recommending that a case be dismissed, was protected by the First Amendment. *Id.* at 1960–61. The Supreme Court held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. *See Id.*, at 1960. Here, *Garcetti* is inapplicable as Albert's speech was not made pursuant to his official duties.

The next issue to consider is whether

Albert's Original Complaint [26] concerned matters of public concern. The Second Circuit has noted that "if the basis for a First Amendment retaliation claim is a lawsuit, the subject of the lawsuit must touch upon a public concern." *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir.2005) (citing *Cobb*, 363 F.3d at 105–06). In *Konits*, the Second Circuit vacated the district court's grant of summary judgment in favor of the defendants and remanded the case for further proceedings. *Konits*, 394 F.3d at 126. The district court had granted summary judgment against a tenured high school music teacher's § 1983 action alleging First Amendment retaliation on the basis that an earlier retaliation suit filed by the teacher did not address a matter of public concern. *Id.* at 124–25. In vacating the district court decision, the Second Circuit noted that the teacher essentially argued that she was subjected to ongoing retaliation for her support of a peer who allegedly had been subjected to gender discrimination by the defendant. *Id.* at 124. The *Konits* court reasoned that "when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern." *Id.* at 125 (citing *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir.2004); *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir.2003)). Therefore, the Second Circuit found that the teacher's motive in speaking out on her peer's behalf was not to redress her own personal grievances but, instead, had the broader purpose of helping the peer to redress her claims of gender discrimination. *See Konits*, 394 F.3d at 126.

Under the reasoning of *Konits*, Albert's Original Complaint touches upon a matter of public concern because the claims allege general concerns of the policies and practices within the HPD. Three of the four counts addressed in the Original Complaint were brought pursuant to civil rights statutes. Substantively, while many of the paragraphs in the Original Complaint relate to Albert's personal dissatisfaction with the conditions of his employment, Count Three, in essence, alleges that misfeasance and discriminatory policies exist within the HPD. Numerous courts have recognized that such speech plainly addresses issues of public concern. *See Skehan v. Village of Mamaroneck*, 465 F.3d 96, 107 (2d Cir.2006) (finding that police department misfeasance along with allegations of a cover up and attempts to silence those who spoke out against it, are matters of public concern); *Feingold*, 366 F.3d at 156–57 (finding that a complaint of discriminatory treatment is a matter of public concern).

Perhaps the best example that Albert's lawsuit alleges misfeasance or discrimination, and therefore a public concern, is in paragraph four of Count Three, which reads: "The defendant City of Hartford, maintained a policy of retaliating against persons seeking redress from the police department by promoting false charges and prosecutions against those individuals, in violation of the First Amendment [of] the United States Constitution." Further, paragraph one of Count Three incorporates the allegations of Counts One and Two, which is important for the assertions set forth in paragraphs fifteen and sixteen of Count One. These paragraphs state:

26. Albert's Original Complaint was filed on June 24, 2003, and his Amended Complaint was filed on June 30, 2004. Count Five of the Amended Complaint alleges that the Individual Defendants violated Albert's First Amendment right to be free from retaliation. Count

Five alleges that this violation arose due to the Individual Defendants' actions towards Albert after he filed the Original Complaint. Since the basis of the retaliation claim is the Original Complaint, it is from this that the court examines the issue of public concern.

"15. The plaintiff is a white male and was demoted during the same time period that another white male Lieutenant was demoted. 16. The two white male demotions created vacancies that were filled by the defendants with black males." Whereas these allegations may not have been sufficient to establish Count One as asserting a public matter, their incorporation into Count Three reinforces the allegation that the city may have a policy that implicates system wide discrimination. *See Halstead v. N.Y. City Transit Auth.,* No. 99 Civ. 3450, 2002 U.S. Dist. LEXIS 26963, at *56 (E.D.N.Y. Dec. 30, 2002) (finding that when a formal complaint regarding discrimination has been filed, the action "may speak on a matter of public concern where the complaints contained therein implicate system-wide discrimination"). Therefore, Albert's Original Complaint touches upon a matter of public concern.

### 2. Adverse Employment Actions

■ The Second Circuit has held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004). In *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006), the court explained that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.... This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions." *Id.* (internal quotation marks omitted; internal citations omitted).

In the present case, the Individual Defendants argue that Albert cannot show that an adverse employment action has been taken against him for filing the Original Complaint on July 24, 2003. The Individual Defendants also claim that Albert was transferred to the detention division on June 8, 2003, and that the charges that led to his fifteen day suspension were assessed well before the date of the Original Complaint. Albert counters that he was retaliated against, and continues to be retaliated against for the filing of this lawsuit. Specifically, he claims that the fifteen day suspension occurred sometime after the August 5, 2003 disciplinary hearing, thus constituting an adverse action.

Prior to determining whether Albert suffered an adverse employment action, the court must establish a time line for when the Individual Defendants' actions could be considered retaliatory. The Individual Defendants argue that the earliest point in time when the retaliatory actions could have started was after the fifteen day suspension was issued. The court disagrees. The earliest time when each Individual Defendant could have retaliated was on the day when they were given notice of the lawsuit. The Original Complaint, filed on July 24, 2003, was served on the City, Chief Marquis, Assistant Chief Jones, Captain Heslin, and Lieutenant Kenary on July 29, 2003, and on Captain Perez on August 5, 2003. The Amended Complaint, which added Assistant Chief Reilly and Manager Ilg, was filed on June 30, 2004. Service was made on Assistant Chief Reilly on July 27, 2004, and on Manager Ilg on July 28, 2004. Accordingly, any retaliatory events concerning Chief Marquis, Assistant Chief Jones, Captain Heslin, and Lieutenant Kenary would have occurred after July 29, 2003, any retaliatory events concerning Captain Perez would have occurred after August 5, 2003, any retaliatory events concerning Assistant Chief Reilly would have occurred after July 27, 2004, and any retaliatory events concerning Manager Ilg would have occurred after

July 28, 2004.[27]

Next, the court will address whether Albert suffered an adverse employment action. A review of the entire record indicates that Albert suffered an adverse employment action when he was forced to defend, at the disciplinary hearing, against the charge that he violated Section 8.04. Under the circumstances, the fact that Albert was forced to defend himself at a disciplinary hearing may, at the least, create an issue of fact as to the existence of an adverse employment action. *See Zelnik,* 464 F.3d at 225 (finding that the adverse action prong is satisfied by subjecting a plaintiff to lesser actions such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities") (internal quotation marks omitted). Further, while this court recognizes that disciplinary hearings are not per se adverse actions, the facts concerning Albert's disciplinary hearing certainly could have a deterrent effect on other officers. *See Washington,* 373 F.3d at 320 (finding that "the threat of administrative disciplinary proceedings, and the concomitant thirty-day suspension without pay ... could have a deterrent effect on other officers who wished to protest the Department's allegedly discriminatory practices and policies") (internal citations omitted).

Albert's disciplinary hearing could have a deterrent effect on other officers from protesting the HPD's allegedly discriminatory policies and practices because it appears that Albert was forced to defend against a charge that the Individual Defendants knew lacked merit. Albert was forced to defend against the charge that he violated Section 8.04 for the late incident on May 30, 2003. Although Albert admits to this tardiness, he was late because he was not informed of his shift change. Assistant Chief Jones knew this was the case. (Dkt.# 70, Ex. 1.) This fact is evidenced in the report of disciplinary infraction where Captain Pawlina wrote: "Proceed with discipline to advocate. It does appear that [Sargent] Albert was not notified of assignment change." (*Id.*) Assistant Chief Jones assented to Captain Pawlina's note by signing his name to the report and dating it June 19, 2003.(*Id.*); (Dkt. # 70, Ex. 15, Captain Pawlina Depo. p. 45–46.) Further, the reasoning behind not sustaining this charge was exactly the same as what Captain Pawlina had written when assessing the charge. The reasoning provided was as follows: "There is no evidence that Sergeant Albert was notified of a change in his assignment or starting time in advance of his arrival at 0730 on May 30th. It is therefore unreasonable to expect that Sergeant Albert would have known that his starting time and assignment had been changed." (Dkt.# 70, Ex. 3.) Therefore, the Individual Defendants decision not to drop this charge from the disciplinary hearing is quite suspicious. Had the Individual Defendants dropped the charge at any time prior to the disciplinary hearing, Albert would not have had to expend the time and resources needed to defend against it. Thus, it was clearly adverse.

The Individual Defendants argue that the disciplinary hearing can not serve as a basis for retaliation because the charges addressed at the hearing, and the subsequent investigation of these charges, both occurred before Albert filed the Original

---

**27.** The court recognizes that each Individual Defendant may have known that he or she was going to be sued prior to the date of service.

Complaint. While the court agrees that the dates of the charges and the investigation precede the filing of the Original Complaint, the Individual Defendants could have dropped these charges at any moment prior to the hearing if the evidence showed that they lacked merit. Dropping such charges would have decreased the expense and inconvenience of defending against this violation. Accordingly, the Individual Defendants failure to do so thereby renders the disciplinary hearing an adverse action.

Even assuming that the disciplinary hearing was not an adverse action, Albert suffered another adverse action when Albert was suspended for fifteen days. The fifteen day suspension was issued on September 23, 2003, and is a form of reprimand, one of the traditionally recognized adverse actions. *See Zelnik,* 464 F.3d at 225. The court does not agree with the Individual Defendants' argument that their actions are not retaliatory because the Code violations that lead to the suspension occurred prior to the date the lawsuit was filed. While it is true that these incidents did precede the filing of the lawsuit, the undisputable facts show that notice of the decision was issued to Albert in a letter dated September 23, 2003. Examined in the light most favorable to Albert, the court concludes that this instance qualifies as retaliatory.[28]

Even assuming that the suspension was not an adverse action, a jury could reasonably conclude that Albert was retaliated against when the Individual Defendants refused to transfer Albert from the detention division. Sometime on or after March 23, 2004, Albert sought a transfer out of detention to patrol, but this request was denied by Assistant Chief Jones.[29] There is evidence suggesting that Albert's request may have been denied because he filed the present lawsuit. First, there is evidence showing that one of the reasons why Albert was kept in detention was because it was a division run by Lieutenant Lopez, who was not a defendant to the lawsuit.[30] (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo p. 72). Second, there is evidence shows that Albert was a good worker who deserved to be transferred out of detention. Lieutenant Lopez testi-

---

**28.** This is the case for each of the Individual Defendants except for Assistant Chief Reilly and Manager Ilg who were not served until July 2004.

**29.** This date is an approximation. It was deduced from the second deposition of Albert given on May 18, 2004, when the following testimony was given:

Q: Tell me what is happening that you're calling a hostile atmosphere that you're working in.

A: Well, I visited [Assistant Chief] Kevin Jones and asked if there was a reason why I was banished to [d]etention and I'd like to come out. They refused.

Q: When was this?

A: Within the last eight weeks or so.
(Dkt. # 70, Ex. 15 Albert Depo II. p. 41.)

**30.** Q: Did you ever hear [Assistant Chief Jones] talk to you in any way about why Albert was transferred from [p]atrol to [d]etention?

A: The only explanation I got for that was because he's not suing me.

Q: Jones told you that?

A: Yes.

Q: What did he say?

A: He's not suing me. That's one of the reasons why.

Q: Who is not suing you?

A: Dan Albert.

Q: But Dan Albert is suing him?

A: No, me.

Q: Oh, okay. Because Albert doesn't have a suit against you, that's why he was transferred to [d]etention?

A: That was one of the reasons, yes.
(Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. p. 72.)

fied that Albert was a good worker who did not break the rules. (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. pp. 129–30.) Lieutenant Lopez was surprised that Albert's request was denied because he told the Individual Defendants that: "[Albert] did [his time in detention] well, and now he wishes to be in regular [p]atrol, and I think we should meet his request; that there was not a reason to keep him in detention." (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. p. 129.) In his endorsement of Albert, Lieutenant Lopez further explained that "[i]f [Albert] messes up while he's in [p]atrol, then terminate him." *Id.* Third, there is evidence that the Individual Defendants kept Albert in detention as a punitive measure. In his deposition, Lieutenant Lopez stated that he believed that his bosses viewed detention as a disciplinary or punitive measure because an officer is tucked away and no one else sees him. (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. p. 134.) In addition, the physical conditions and standards of detention are difficult to deal with because detention smells of excrement and is filled with prisoners who are screaming, yelling, cursing, violent and crazy. (Dkt. # 70, Ex. 15, Lieutenant Lopez Depo. p. 131.) Given this evidence, a reasonable jury may find that the Individual Defendants' unwillingness to grant a well-behaved Albert his transfer request suffices as an adverse employment action.

Finally, even assuming that the disciplinary hearing, suspension and failure to transfer Albert out of detention are not distinctly adverse actions, when considering the totality of the events, there was an objective change in Albert's work environment such that it constitutes an adverse employment action.[31] *See Riccio v. City of W. Haven,* 196 F.Supp.2d 181, 186 (D.Conn.2002) (citing *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002)) ("[A] plaintiff also may show an adverse employment action using an objective standard by demonstrating that the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace").

### 3. Causal Connection

Since Albert has established the first two elements of a First Amendment retaliation claim, he must set forth a causal connection "sufficient [enough] to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994). A plaintiff can establish a causal connection between his speech and the adverse employment action through indirect evidence that "the protected activity was closely followed in time by the adverse [employment] action," *Reed v. A.W. Law-*

---

**31.** The totality of the events also include evidence showing that the Individual Defendants acted suspicious in a variety of other ways that a reasonable jury may deem to be adverse. First, it appears that Albert was forced to defend against charges that other similar officers would not have had to defend against. For example, the evidence shows that Chief Marquis had knowledge that another lieutenant had left her post unattended for several hours while she was supposed to be on duty. (Dkt. # 70, Ex. 15, Chief Marquis Depo. pp. 37–39.) This lieutenant was not charged with violating the Code of Conduct and was not forced to defend herself at a disciplinary hearing. The fact that Chief Marquis knew of this disparity and still choose to have Albert defend himself against minor charges such as taking an extended lunch break could be considered an adverse action. Second, Assistant Chief Reilly testified that an officer who was late for the first time would normally not be disciplined. (Dkt. # 70, Ex. 15, Assistant Chief Reilly Depo p. 51.) The fact that Albert was disciplined and forced to defend against this violation also could be considered an adverse action.

*rence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996), or by direct evidence of retaliatory animus, *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999). *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000) (finding that causation may be proved indirectly "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence"); *Knight v. City of New York*, 303 F.Supp.2d 485, 497 (S.D.N.Y.2004) ("Mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action [can be accepted as] sufficient evidence of causality ... [but] the temporal proximity must be very close"). As retaliatory motive is rarely proven by direct evidence, *Housing Works, Inc. v. City of New York*, 72 F.Supp.2d 402, 422 (S.D.N.Y.1999), *appeal dismissed*, 203 F.3d 176 (2d Cir.2000), most plaintiffs establish causation through circumstantial evidence.

■■■ Albert has presented sufficient indirect evidence that the protected activity was followed closely in time by the adverse employment action. After Albert filed the Original Complaint, the disciplinary hearing occurred within two weeks, the fifteen day suspension was issued within two months, and the refusal to promote Albert from detention occurred sometime within nine months.[32] The time gap between the speech and the adverse acts is close enough to establish an inference of a causal relationship. *See Morris*, 196 F.3d at 102 (finding that an inference of causation was suggested by the two year period between the protected speech and the adverse employment action); *Grant v. Beth-*

*lehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir.1980) (finding that an inference of causation is established when there is an eight month gap between the protected speech and the adverse action); *Bernhardt v. Interbank of N.Y.*, 18 F.Supp.2d 218, 226 (E.D.N.Y.1998) (determining that eleven months is close enough to establish an inference of a causal connection to plaintiff's termination). Therefore, given the evidence that exists in this case, Albert has demonstrated the requisite proof of a causal connection to defeat the Individual Defendants motion for summary judgment. *See Birmingham v. Ogden*, 70 F.Supp.2d 353, 368 (S.D.N.Y.1999) (finding that the plaintiff could defeat summary judgment through setting forth circumstantial evidence that he had been denied access to regular police meetings, excluded from afternoon car rides, and that the chief and two lieutenants had allegedly contributed to trumping up the plaintiff's wife's domestic abuse complaint).

Even assuming that a plaintiff can establish these three factors, the defendant can succeed on summary judgment if he can show, by a preponderance of the evidence, that "it would have taken the same adverse employment action even in the absence of the protected conduct." *Morris*, 196 F.3d at 110 (internal quotations omitted). To make this determination, courts look to the test set forth in *Connick* and *Pickering v. Board of Ed.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 557 (2d Cir.2001). Under this test, the defendant employee may offer evidence that the em-

32. The nine month time limit is a deduction by the court as the specific date of the request for promotion is not apparent from the record. The court, instead, looks to the date of the deposition in which the event was taken. The refusal to promote Albert was mentioned in the deposition of Lieutenant Lopez, taken on April 16, 2004. Therefore, since the matter was discussed therein, the court deduces that Albert must have sought promotion from detention within nine months of filing the Original Complaint.

ployee's conduct interfered with the employer's "effective and efficient fulfillment of its responsibilities to the public ... to such an extent that the trial court determines that the interest of the employer in providing effective and efficient public services outweighs the employee's First Amendment right to free expression." *Id.* (citation omitted; internal quotations omitted).

Here, the Individual Defendants have neither argued nor set forth any evidence that shows that it would have taken the same adverse employment actions in the absence of the protected conduct. *See Cotarelo,* 460 F.3d at 252. Given the absence of any evidence showing that Albert interfered with the police department's responsibilities to the public, the court finds that the Individual Defendants have failed to meet their burden.

#### 4. Failure to Exhaust

The Individual Defendants also contend that, with respect to Albert's fifteen day suspension, the court has no jurisdiction to consider the First Amendment retaliation claim due to the failure to exhaust his grievance and arbitration procedure. In support of this contention, the Individual Defendants cite to the Supreme Court case of *Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In *Vaca,* the court stated: "if [a] wrongfully discharged employee himself resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted. Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual

rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." [33] *Id.* (citing *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) (holding that "federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress") (emphasis in original)).

The *Vaca* decision, however, is not applicable to the present case because Albert's claim is not that the Individual Defendant's breached the CBA. Rather, he alleges that they violated the First Amendment by retaliating against him for filing this lawsuit. Since Albert's claim does not concern the CBA, whether Albert exhausted his administrative remedies is not an issue that this court needs to consider. Indeed, courts have recognized the principle that a plaintiff employee who sets forth a claim based on a federal statute that protects constitutional rights is not subject to the arbitration clause of a CBA. *See Grennan v. Nassau County,* No. CV–04–2158 (DRH)(WDW), 2007 WL 952067, *22, 2007 U.S. Dist. LEXIS 23087, at * 67 (E.D.N.Y. Mar. 29, 2007) (citing *Fayer v. Town of Middlebury,* 258 F.3d 117 (2d Cir.2001)).

Accordingly, Albert has established the three factors for succeeding in a First Amendment retaliation case, and there is no issue as to the exhaustion of remedies. The Individual Defendant's motion for summary judgment as to Count Five of the Amended Complaint is **DENIED.**

---

**33.** The Supreme Court also explained two exceptions to this rule, both inapplicable to the present case.

### G. Qualified Immunity

The Individual Defendants allege that they are entitled to qualified immunity as to Counts One, Two and Five of the Amended Complaint. As Counts One and Two have been dismissed, the court need only address whether the Individual Defendants are qualifiedly immune from the claim of First Amendment retaliation. The Individual Defendants claim that they enjoy qualified immunity because Chief Marquis' recommendation for demotion, and Albert's subsequent transfer and demotion, were each objectively reasonable because the probationary evaluations showed that Albert lacked the judgment and decision making skills required of probationary employees. Furthermore, these decisions were reasonable because Chief Marquis received Internal Affairs investigation reports and other records reflecting Albert's conduct. Albert counters that the Individual Defendants are not entitled to qualified immunity because each has purposefully and intentionally violated his civil rights.

In deciding whether the Individual Defendants are subject to a suit for damages pursuant to § 1983, a court must first decide if the facts alleged make out the deprivation of a constitutional right. *Skehan*, 465 F.3d at 107 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). If those facts would constitute a deprivation, the court should grant qualified immunity if either the legal right allegedly violated was not clearly established at the time of the defendant's conduct, or the defendant's action was objectively reasonable in light of the clearly established legal rules then in effect. *See Skehan*, 465 F.3d at 107. The Defendants may benefit from qualified immunity if plaintiff is unable to establish any of these steps. *See X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir.1999) ("These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.") Accordingly, "[s]ummary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert*, 331 F.3d at 37 (internal quotation marks omitted).

As indicated in the First Amendment retaliation section, when the evidence is construed in the light most favorable to Albert, genuine issues of material fact remain for a jury to decide. Therefore, the first question to consider here is whether Albert's right was clearly established at the time of the Individual Defendant's conduct. *See Skehan*, 465 F.3d at 107. The evidence shows that at the time of the alleged retaliatory actions, Albert had filed the lawsuit thereby establishing the legal right that he alleges was violated. *Id.* Further, "[i]t has long been established that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government." *Catletti v. Rampe*, 334 F.3d 225, 231 (2003) (internal quotation marks omitted). As there is no indication that Albert's lawsuit disrupted the administration of the government, this court finds that no reasonable officer could believe that retaliating against Albert on the basis of his statements would not have violated his First Amendment rights. *See Russo v. City of Hartford*, 341 F.Supp.2d 85, 104 (D.Conn.2004).

The next question to consider is whether the Individual Defendants' actions

were objectively reasonable. Under this prong, the court refuses to grant summary judgment for two reasons. First, a review of the record shows that questions remain as to whether the Individual Defendant's actions were objectively reasonable in light of the clearly established legal rules. The evidence does show, however, that the Individual Defendants had knowledge of Albert's lawsuit and that, within a close proximity of time to this notice, subjected him to the adverse actions.

Second, while the second prong typically considers whether an objective officer would have thought his actions were reasonable, the violations alleged in this case require a subjective inquiry into the minds of the Individual Defendants. "[T]hough the qualified immunity inquiry is generally an objective one, [the] defendant's subjective intent is indeed relevant in motive-based constitutional torts.... Further, [w]here a factual issue exists on the issue of motive or intent, [the] defendant's motion for summary judgment on the basis of qualified immunity must fail. To find otherwise would be to allow [the] defendants accused of motive and intention-based constitutional violations to be entitled to immunity in any case where they could point to some arguably legitimate grounds for their actions." *Russo*, 341 F.Supp.2d at 104 (citation omitted; internal quotation marks omitted). Accordingly, because Albert has set forth sufficient evidence to show that question regarding the Individual Defendants objective and subjective intentions, qualified immunity is inappropriate and summary judgment as to Count Five is **DENIED**. *See Mandell*, 316 F.3d at 385 ("Where specific intent of a defendant is an element of [the] plaintiff's claim under clearly established law, and [the] plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate").

## III. CONCLUSION

For the foregoing reasons, (1) the Defendants' Motion for Summary Judgment (dkt.# 58) is **GRANTED** as to Counts One, Two and Four, (2) the City Defendant's Motion for Summary Judgment (dkt.# 58) is **GRANTED** as to Count Three, and (3) the Individual Defendants' Motion for Summary Judgment (dkt.# 58) is **DENIED** as to Count Five. **Judgment in favor of the City of Hartford, Chief Marquis, Assistant Chief Jones, Assistant Chief Reilly, Captain Heslin, Captain Perez, Lieutenant Kenary, Captain Pawlina, City Manager Ilg shall enter on the First, Second and Fourth Counts of the Amended Complaint. Judgment in favor of the City of Hartford shall enter on the Third Count of the Amended Complaint. The Fifth Count of the Amended Complaint, against Chief Marquis, Assistant Chief Jones, Assistant Chief Reilly, Captain Heslin, Captain Perez, Lieutenant Kenary, Captain Pawlina, City Manager Ilg, is the sole remaining claim of the action.**

**SO ORDERED.**